476 So.2d 800 (1985)
Musette TURNER
v.
NEW ORLEANS PUBLIC SERVICE INC.
James V. DRUM
v.
UNITED STATES FIDELITY AND GUARANTY COMPANY et al.
Nos. 84-C-0911, 84-C-1405.
Supreme Court of Louisiana.
June 20, 1985.
*801 Nahum Laventhal, Herman, Herman & Katz, New Orleans, for plaintiff-respondent.
James Maher, III, Wood Brown, III, Montgomery, Barnett, Brown & Read, New Orleans, for defendant-applicant.
M.H. Gertler, John B. Perry, New Orleans, Robert C. Leininger, Jr., Metairie, Raymond P. Augustin, Jr., New Orleans, Darryl D. Sicarelli, Bailey & Leininger, Metairie, Basile J. Uddo, Donald M. Pierce, New Orleans, for respondents.
DIXON, Chief Justice.
These consolidated cases are not related, but have certain common factors. Each plaintiff was a pedestrian. One was injured by a public transportation bus and the other by a truck which was backing up. Writs were granted to determine whether our decision in Baumgartner v. State Farm Mutual Automobile Insurance Co., 356 So.2d 400 (La.1978) was affected by the adoption of the doctrine of comparative negligence by the Louisiana legislature.[1]
Musette Turner was injured in the neutral ground on Canal Street where she was rushing to transfer from one bus to another, but was run over by a third bus. The trial court found Mrs. Turner negligent, held that the Baumgartner case applied, and awarded plaintiff the full amount of her damages. The court of appeal affirmed. 449 So.2d 139 (1984).
James Drum, sent on an errand by his employer, entered a warehouse where trucks were being parked and was knocked down by a truck traveling in reverse within the warehouse. In Drum's case the district court applied comparative fault and awarded Drum only 50% of his damages. The court of appeal reversed, 454 So.2d 267 (1984), and awarded plaintiff 100% of his damages, holding that the pedestrian's fault in a case like Drums's is not contributory negligence, and that consequently comparative negligence principles do not apply.
Mrs. Turner rushed across part of Canal Street to catch a bus on the other side of the neutral ground. She failed to see a bus moving toward her at about ten miles an hour until a woman near her screamed. When she tried to avoid the bus, she fell down and the bus ran over her foot.
Drum was sent by his employer to collect money owed his employer from a Mr. Freeman, who owned a business across the street from the warehouse where plaintiff was injured. Freeman's son told Drum that Freeman was in a warehouse across the way. Drum entered the warehouse and was about 100 feet from the entrance. Workmen for a welding supply house were parking their trucks in the warehouse as usual at the end of the day. A truck backing in hit Drum and injured him severely. Drum neither saw nor heard the truck that hit him until too late. The truck driver never saw Drum. The truck had no lights and no warning device. It was equipped with a rear view mirror on the driver's side and on the passenger side of *802 the cab. There were no other witnesses to the accident.
Both plaintiffs contend that under the wording of the new statute, comparative negligence does not apply in pedestrian-motorist cases. Their contention emphasizes the clause "[w]hen contributory negligence is applicable to a claim for damages ..." Plaintiffs argue that, since Baumgartner abolished the defense of contributory negligence in pedestrian-motorist cases, article 2323 does not apply because, by its express terms, it deals only with the effect of contributory negligence.
Defendants, on the other hand, claim that the decision in Baumgartner instituted a "humanitarian doctrine" designed to avoid the harsh consequences of the "all-or-nothing" rule of contributory negligence. They argue that comparative negligence obviated the need for a "Baumgartner" rule.
Since the new legislation equitably adjusts the right to recover for personal injuries by comparing the fault of both victim and defendant by reducing the plaintiff's recovery in proportion to his contribution to the accident, the need to perpetuate the "humanitarian doctrine," it is argued, is no longer present.
The Drum case is inapplicable to our inquiry because there is no evidence of any negligence on Drum's part. He had walked about 100 feet into the warehouse from its entrance. He was in a place where "it wasn't unusual for somebody to be." The truck approached him from behind without warning and knocked him down before he saw it.
The driver of the truck backed in for about 100 feet without being able to see behind him, with no back-up light or backup signal, and never saw Drum until after he had run over him.
The only argument the defendants make is that Drum was negligent in not hearing the approach of the truck, in spite of the fact that there was no evidence that Drum was able to hear the truck approach.
Backing a truck without knowing whether it can safely be done is grossly negligent. (See, for example, R.S. 32:281(A): "The driver of a vehicle shall not back the same unless such movement can be made with reasonable safety and without interfering with other traffic."
If the driver of a backing vehicle could reasonably have avoided the accident, he is responsible for injuries caused when he strikes a pedestrian in his path. Guilbeau v. Liberty Mutual Insurance Co., 338 So.2d 600 (La.1976); Reeves v. Louisiana and Arkansas Railway Co., 282 So.2d 503 (La.1973).
The court of appeal was correct in awarding Drum 100% of his damages, not because of the Baumgartner rule but because the truck driver was 100% at fault, and Drum was not at fault to any degree.
Musette Turner's case is another matter. She had completed the first leg of her trip and was headed to the proper place to catch the second bus, when a third bus ran over her.
Both driver and pedestrian were negligent in this case. The driver did not see plaintiff. One of his passengers, sitting near the driver, did, and knew the plaintiff was on a collision course with the bus. Either party could have avoided the accident, but the bus continued, and plaintiff's foot slipped under a wheel when she realized how close she was to the moving bus. Plaintiff was in a pedestrian crosswalk, but probably in the path of the bus; the bus had the green light. The Baumgartner case would not have permitted New Orleans Public Service to escape liability by proving plaintiff's negligence, because the driver could have avoided the accident by the exercise of reasonable care.
To the extent that the decision in Baumgartner placed the value of human life above the rigid applications of common law rules, it could be called humanitarian, as is the doctrine of comparative fault. The object of Baumgartner was not to compare negligence, however. It was to compare fault; it was to compare blameworthiness; *803 it was an effort to make sense in a small area of the law in which the actor with the greatest protection and the greatest capacity for harm to the other was insulated from responsibility for the accident, something he could have clearly and easily avoided by the exercise of reasonable care. Instead, it was thought that it would be sensible to protect the weak and (except to himself) harmless, because the pedestrian's carelessness could be so devastating to himself, and relatively harmless to others. The dissent in Baumgartner, 356 So.2d 400, 407, followed traditional tort law, which would have permitted the motorist to kill the pedestrian and escape all penalty, regardless of his blameworthiness. Simple justice seemed to require the readjustment of responsibility. Placing the greater responsibility on the actor whose fault can cause the greater havoc is not only sensible and economic, it also satisfies the greatest interest of civilized societythe lives and safety of its members.
The issue is whether comparative negligence (or comparative fault) principles apply in motorist-pedestrian cases like Baumgartner, or whether a pedestrian injured by a negligent motorist can recover his damages without reduction based on comparison of fault of the parties.
Baumgartner was decided January 30, 1978 and rehearing was denied on March 15, 1978. C.C. 2323 was amended to its present form by Act 431 of 1979, to become effective on August 1, 1980, over two years after the finality of the Baumgartner case.
Act 431 of 1979 not only amended C.C. 2323, but also C.C. 2103 and C.C. 2324. C.C. 2103 now provides for the division of an obligation arising from an offense or quasi offense "in proportion to each debtor's fault." C.C. 2324 now provides that "[p]ersons whose concurring fault has caused injury, ..." are solidarily liable but that one judgment debtor should "not be liable for more than the degree of his fault to a judgment creditor to whom a greater degree of negligence has been attributed,..." (Emphasis added).
Whether the rule of the Baumgartner case is still applicable depends on its interpretation and the interpretation of the new C.C. 2323, which begins: "When contributory negligence is applicable to a claim for damages, its effect shall be as follows:..."
"Fault" and "negligence" might have been used interchangeably by the legislature, but probably were not. It is common knowledge in the legal profession that "fault" includes more than negligence. See Malone, Prologue, 40 La.L.Rev. 293 (1980); Stone, 12 Civil Law Treatise § 59 et seq. (1977); Tunc, Fault: A Common Name for Different Misdeeds, 49 Tul.L.Rev. 279 (1975); Stone, Tort Doctrine in Louisiana: The Concept of Fault, 27 Tul.L.Rev. 1 (1952).
Willful acts, violations of statutes, breaches of the obligations of vicinage, for example, create liability as "fault" under C.C. 2315.
C.C. 2323 uses "fault" and "negligence" in the same breath: "If a person suffers injury, ... as the result partly of his own negligence and partly as a result of the fault of another ..." his claim will not be defeated, but the damages recoverable "shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury ..." (Emphasis added).
Act 431 of 1979 also amended Code of Civil Procedure article 1811. In each instance when defendant's culpable acts were referred to, the word "fault" was used. In each instance when plaintiff's or injured person's culpable acts contributing to the injury are referred to, the word used is "negligence."
Nothing in the act itself, or in the history of the act, tells us why plaintiff's acts contributing to the injury are called "contributory negligence" and defendant's culpability is called "fault." The Uniform Comparative Fault Act, § 1, 12 Uniform Laws Annotated (West 1975, pocket supp.) dealt with the effect of plaintiff's contributory fault, and included the defense of *804 "assumption of risk" and "misuse of product." Whether the uniform act was available to the legislators is not known.
If "contributory negligence" was used instead of "contributory fault" in order to preserve some exceptions in the jurisprudence which permitted plaintiff to recover in full, in spite of some contributory negligence of his own or in spite of a bar to recovery by the application of the last clear chance doctrine, it would seem that such a legislative purpose could have been clearly stated. It is more likely, considering proclivities of lawyers and legislators, that tough details were left for the courts to decide. (See Wade, The Development of Comparative Negligence and Its Present Status in Louisiana, 40 La.L.Rev. 299, 313 (1980)).
Act 431 seems to be the result of an effort to make a comprehensive change in the law governing suits for personal injury or other damage. The inequity in the "all-or-nothing" recovery chances of a personal injury victim was recognized; the all-or-nothing effect of contributory negligence is specifically abolished.
Are we to believe that a policy permitting all-or-nothing recovery was intended to be retained in cases in which a defendant, guilty of fault, raises the defense of assumption of risk? Or misuse of the product? Or willfulness of the plaintiff? Specifically, did the legislators intend to continue the effect of jurisprudence which restricted the application of the contributory negligence doctrine, and allowed full recovery for injury to negligent pedestrians? (Baumgartner v. State Farm Mutual Automobile Insurance Co., supra; Guilbeau v. Liberty Mutual Insurance Co., supra; Belshe v. Gant, 235 La. 17, 102 So.2d 477 (1958)). Did a reform movement, designed to counter the all-or-nothing tort recovery intend to retain a doctrine which allowed full recovery to a driver who parks in a curve on a railroad track? (Reeves v. Louisiana and Arkansas Railway Co., supra). And all without a word? One word would have done the job: "Only when contributory negligence is applicable ..."
Legislative intent, frequently employed by courts in statutory interpretation, is so obscure and uncertain as to C.C. 2323 that caution should be employed in attributing any intention to the legislature not expressed in the statute. There is no doubt, however, that contributory negligence, "as a complete bar to recovery, was eliminated, and that comparative fault may be applied in certain categories of cases to reduce the plaintiff's recovery." Bell v. Jet Wheel Blast, Division of Ervin Industries, 462 So.2d 166, 171 (La.1985).
C.C. 2323 does not command the court to adhere to or select any particular rule to apply in pedestrian cases. Nor does it prohibit the complete protection of an injured plaintiff, without regard to his fault, in the appropriate case. We conclude, however, that the "Baumgartner" exception is no longer necessary to accomplish all its legitimate purposes, and our sense of justice requires its elimination. The removal of this exception from consideration in pedestrian cases adds consistency and symmetry to the method of solving problems involving accident victims, contributes to the ease of administering a system of accident law, and is a relatively simple means of accomplishing a fair result, even in the bizarre cases, which arise in a motorized country.
Care should be taken, however, to note that we do not hold that the victim's fault shall always reduce his compensation. There are cases in our literature in which injured persons have been allowed recovery (cases in which the contributory negligence of the plaintiff did not prohibit recovery). Some of those cases (which we do not propose to specify) should produce the same result today. See Bell v. Jet Wheel Blast, Division of Ervin Industries, supra, where we held that Bell's recovery should not be diminished because of his contributory negligence. The legitimate objectives of accident law, in all probability, will require us to reach a similar conclusion in some future cases.
We conclude, therefore, that Baumgartner is no longer needed, and that the *805 legislative plan to proportion recovery according to fault is a superior solution to the problem before us. Act 431 of 1979 has obviated the need for its continued application. Cases like Baumgartner will henceforth be governed by the comparative fault doctrine of C.C. 2323.[2]
Musette Turner's fault was that she walked almost into the path of an approaching bus, slipped and fell when she tried to save herself. She put no other person in peril. Her own negligence, however, contributed to her injury. Compared to the driver's fault, Turner's fault was slight. The driver failed to see a pedestrian on a collision course with his bus, at an intersection where he knew passengers transferred from one bus to another. There was no reason why he couldn't see Turner. If he had only seen her in the crosswalk he could easily have avoided the accident. The consequences of his failure could have been tragic. The greater the risk of harm to others, the greater is the fault.
Turner's fault is fixed at 10%; the driver's fault is fixed at 90%. The judgment of the lower courts is reduced by 10%, and there is now judgment in favor of plaintiff, Mussette Turner, and against defendants, New Orleans Public Service Inc. and Tommy Bolds in the amount of $3253.05, at the cost of defendants.
In James V. Drum's case, the judgment of the court of appeal is affirmed, at the cost of defendants.
MARCUS, J., concurs and assigns reasons.
DENNIS, J., assigns additional reasons.
BLANCHE, J., concurs and assigns reasons.
WATSON, J., concurs in the result.
LEMMON, J., concurs and assigns reasons.
MARCUS, Justice (concurring).
I agree that Baumgartner no longer applies under the comparative fault doctrine of La.Civ.Code art. 2323. However, I consider that art. 2323 does require that plaintiff's recovery be reduced to the extent of his fault in all cases arising under comparative fault. Accordingly, I concur in the result reached here.
LEMMON, J., concurring.
The Baumgartner decision was based on comparison of duties. Although the Baumgartner rationale is not applicable in comparative fault case, comparison of duties remains one of the considerations in the determination of the degree by which a blameworthy plaintiff's recovery should be reduced. When the plaintiff is partially at fault, the proportionate percentage of reduction should be based on considerations not only of his fault, but also of the respective degrees of duty of the various parties and the degree of causation involved in each party's breach of that duty.
In the present case, the trial court determined that both parties were at fault.[1] A comparison of the respective duties of the parties dictates that the bus driver should be assigned a higher degree of fault.[2]
BLANCHE, Justice (concurring).
This writer agrees that Baumgartner no longer applies under the comparative fault doctrine found in La.C.C. art. 2323. However, this writer does not agree with the portion of the opinion that attempts to breathe life into Bell v. Jet Wheel Blast, 462 So.2d 166 (La. 1985) by citing that opinion as authority for the proposition that a plaintiff's recovery may not always be reduced in proportion to his fault. Jet Wheel Blast was a lame duck certification case that concerned a products liability action that occurred prior to the passage of the comparative fault statute. It should not be *806 cited as blanket authority for the idea that plaintiff's recovery should not be reduced by his fault in all cases arising under C.C. art. 2323.
This opinion and the opinion in Jet Wheel Blast only complicate the legislature's efforts to do justice between litigants. To say that the doctrine of comparative fault will only be applied in certain cases simply ignores the obvious intent of the legislature in adopting the comparative fault statute. Language such as that found in Jet Wheel Blast which indicates that comparative negligence will be applied where "the threat of a reduction in recovery will provide consumers with an incentive to use a product carefully without exacting an inordinate sacrifice of other interests" and never "where it drastically reduces the manufacturer's incentive to make a safer product" is nothing more than saying that cases will be decided on a socioeconomic basis rather than following the clear requirements of the law. It tells the trial courts to first balance the rights and duties of parties, determine what result is wanted and then decide if the law should be applied. This simply is not what was intended. La.C.C. art. 2323 requires that the plaintiff's recovery be reduced to the extent of his fault in all cases arising under comparative fault.
I respectfully concur.
DENNIS, Justice, assigning additional reasons.
I join fully in the majority opinion and assign additional reasons.
The question posed by this case is of major importance: shall a pedestrian's own negligence be taken into account in a negligence action to reduce his recovery from a motorist who injures the person on foot by his negligent operation of a vehicle?
Article 2323 provides:
When contributory negligence is applicable to a claim for damages, its effect shall be as follows: If a person suffers injury, death or loss as the result partly of his own negligence and partly as the result of the fault of another person or persons, the claim for damages shall not thereby be defeated, but the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death or loss.
As the majority opinion makes clear, this article leaves with the court the discretion it has enjoyed for over 140 years to determine under what circumstances the judicially created doctrine of contributory negligence should be invoked. The article requires the court to apply comparative fault instead of contributory negligence only when the court decides to invoke a defense taking a plaintiff's negligence into account.
A similar question was fully considered and decided by this court in Bell v. Jet Wheat Blast, 462 So.2d 166 (La. 1985), wherein we concluded:
Consequently, a plaintiff's claim for damages no longer can be barred totally because of his negligence. At most his claim may be reduced in proportion to his fault. Thus, the net effect of article 2323, as amended, is to prevent the courts from applying any defense more injurious to a damage claim than comparative negligence. The article does not, however, state when the courts shall permit a defense of contributory or comparative negligence to affect a plaintiff's recovery, nor does it prohibit the courts from applying comparative negligence to a claim previously insusceptible to the bar of contributory negligence. 462 So.2d at 170.
Although the ultimate certified question of whether to apply comparative negligence in a products liability case was answered by a divided vote, none of the justices expressed dissent from the court's interpretation of article 2323 as preserving judicial authority over the question of when a plaintiff's negligence should be taken into account.
Accordingly, the majority opinion in this case concludes that the legislature did not intend either to perpetuate or to abrogate the specific rule of the Baumgartner case. The majority ably demonstrates that the legislature easily could have expressed such an intention but that the statute contains no words to either effect.
*807 Consequently, new article 2323 reenacting comparative fault does not prohibit or mandate expanded duty rules such as Baumgartner. The enactment of the statute, however, indicates that this court will be required to rethink its previous decisions to decide whether each was a mere strategem for avoiding the complete bar to recovery of contributory negligence or whether it was based on independent policy considerations that now militate against the application of comparative fault to reduce plaintiff's recovery. See Johnson, "Comparative Negligence and the Duty/Risk Analysis," 40 La.L.Rev. 319, 338-341 (1980).
Since each expanded duty rule involves a different mixture of policy considerations, the majority opinion correctly focuses on the single rule squarely put at issue by this case, viz., the Baumgartner rule. However, the opinion fails to set forth any of the considerations underlying its decision, and it is for this reason that I write separately to suggest the policies that I believe reasonably inform this Court's resolution of the issue. See generally Johnson, supra.
What factors should be weighed in determining whether to apply comparative fault to reduce plaintiff's recovery in auto-pedestrian accidents? One reasonable approach would be to identify the basic goals of accident law, and then to decide whether application of comparative fault to reduce a negligent pedestrian's recovery furthers those goals more than imposing an expanded duty on urban motorists to exercise reasonable care to protect pedestrians from the risks of their own inattention.
Accident law generally should pursue four primary goals: (1) reduction of the total cost of accidents by deterrence of activity causing accidents; (2) reduction of societal cost of accidents by spreading the loss among large numbers; (3) reducing the cost of administering the accident system; and (4) doing all of these by methods consistent with our sense of justice. It should be noted that these goals are not fully consistent with each other. There cannot be more than a certain amount of reduction in one category of cost without foregoing some of the reduction in the other. Our aim must be to find the best combination of cost reduction in all categories while considering what must be given up in order to achieve that reduction. In other words, the overall goal should be the maximum reduction of the sum of accident costs and the costs of avoiding accidents that can be accomplished in a just way. See G. Calabresi, The Costs of Accidents, pp. 24-33 (Yale University (1979)).
Applying these principles to the class of pedestrian-car accidents, I think it is a very close question whether the goals of accident law would be furthered optimally by imposing an expanded duty upon motorists in urban areas to exercise reasonable care to protect pedestrians from their own inattention and ordinary acts of negligence.
The degree of accident cost reduction which could be achieved by reducing the recovery of careless pedestrians injured by negligent motorists is apt to be small. Because pedestrians are an unorganized group, reduction of individual plaintiffs' awards may not be communicated readily to other pedestrians or immediately influence their conduct. On the other hand, pedestrians generally appear to be in a substantially better position to avoid collisions with negligent drivers than, for example, are laborers to escape injury by defective machinery with which they are forced to work by economic circumstances. If the message that fault reduces recovery is communicated to the pedestrian, he at least has greater power and opportunity to heed it.
Urban drivers also do not comprise a tightly knit class, although they do belong to actuarial groups by virtue of the fact that they are required by law to carry liability insurance. Accident costs allocated to individual drivers may tend to exert some economic pressure for safety because judgments against individual drivers for pedestrian accidents may tend to be communicated within actuarial groups by increased premiums and explanations for them. However, it would not appear that allocation of a portion of auto-pedestrian accident costs to individual negligent pedestrians would remove much of the economic pressure for safety from drivers maintained *808 by generally overall increasing insurance costs.
Reduction of societal cost of accidents by spreading the loss among large groups would not be promoted by apportioning part of the cost of accidents to pedestrians. Insurance specifically designed to cover such losses would be unavailable for pedestrians as a practical matter. If the total costs of auto-pedestrian accidents were placed on the activity of driving, a much greater portion of the costs of such accidents would be spread to actuarial groups.
The costs of administering our treatment of accidents will not be reduced by injecting into each case the difficult issues of whether the pedestrian was at fault and, if so, what percentage of the total fault is to be allocated to him. Thus, allocating a portion of the cost of such accidents to pedestrians will not promote the efficiency of the system or the spreading of such losses and will only slightly affect the conduct of pedestrians.
This Court feels, however, that despite the foregoing economic considerations, a sense of justice requires that a pedestrian's negligence should always be taken into account to reduce his recovery. Undoubtedly, this is due to the perception that it would be inconsistent to hold the motorist responsible for his fault while excusing the pedestrian of his. Nevertheless, a moment's reflection indicates that although this is the prevailing view today, it may not be the judgment of the future. As a practical matter, wherever a superior economic alternative has been presented, our society has shown itself ready to abandon the view that justice requires individual injurers to pay their victims solely on the basis of fault. In such cases, people have tended to prefer the superior economic alternative to the traditional fault system. To gain some sense of this, one need only look at the general acceptance of worker's compensation and at jury verdicts that seem to ignore negligence on the plaintiff's part and lack of negligence on the defendant's. Similarly, the general acceptance of insurance strongly suggests that we do not worry too much about whether the individual faulty party pays his victim, so long as the victim is paid. See Calabresi, supra, p. 304.
In summary, it appears that a reasonable justification for this Court's decision is that in the present negligence system application of the expanded duty rule of Baumgartner is somewhat more desirable from a purely economic standpoint, but that our sense of justice requires that a pedestrian not be permitted to have all of his damages repaired when his own fault contributes to them.
These views cannot be held dogmatically, however; they are debatable and subject to change in the face of superior evidence or arguments. Nevertheless, I am fairly certain that the approach by which they have been derived is the one this Court should take. It is an approach which attempts to calculate realistically the effects of our decision and the rule we thereby adopt in terms of the perceived goals of our law. Under such an approach, even if we are in error, the basis of our decision is open to public examination and mistake can be easily detected and corrected by lawyers and judges in future cases. If we fail to assess our decision in terms of its effects and the goals of our law, or if we shield such reasoning from public and professional scrutiny, the adjustment of any mistake we commit will be made more tortious and problematical.
NOTES
[1] "When contributory negligence is applicable to a claim for damages, its effect shall be as follows: If a person suffers injury, death or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the claim for damages shall not thereby be defeated, but the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death or loss." C.C. 2323.
[2] Bays v. Lee, 432 So.2d 941 (La.App.1983), followed by the court of appeal in the case at hand, is overruled.
[1] The trial court determined that the bus driver should have seen and reacted to the actions of this particular pedestrian, and there is evidentiary support for this conclusion in the record.
[2] The causation factor attributable to each party appears to be approximately equal.