LABORDE, Judge.
On January 9, 1985, plaintiff, Joseph B. Doucet, filed this tort suit against B & R Petroleum Services, Inc. (“B & R”), and its insurer, Western Employer’s Insurance Company (Western), seeking damages for injuries he sustained when an employee of defendant accidentally let go of a cheater pipe which struck the plaintiff on the head.[1] On January 14, 1985, Safeco Insurance Companies (Safeco), the workmen’s compensation insurer of plaintiff’s employer, filed a petition of intervention. Trial was held from October 20, 1987 through October 26, 1987. The jury, by unanimous special verdict found that the plaintiff had sustained damages of $5,000.00 for past pain and suffering and $2,508.89 for past medical expenses. This amount was re *628 duced in accordance with the jury’s finding that plaintiff was 90% at fault and defendant was 10% at fault. Accordingly, the trial court awarded judgment in favor of plaintiff against B & R and Western in solido for $500.00 together with legal interest from the date of judicial demand. The trial court also awarded Safeco $250.89 against defendants in solido, together with legal interest from the date of judicial demand. Plaintiffs motion for J.N.O.V. or alternately for a new trial and Safeco’s motion for a new trial were denied by the trial court. Safeco dismissed its appeal and thus only plaintiff appeals the decision. We find that the jury award in favor of plaintiff was reasonable. However, we find that the jury erred in finding 90% fault on the part of the plaintiff. We find that the plaintiff was 25% at fault and the defendant was 75% at fault. Thus, we amend the judgment in favor of plaintiff to the amount of $3,750.00.
FACTS
Plaintiff was employed as a truck driver by Sam Grimmett, Inc. On January 13, 1984, plaintiff drove a truck towing a mud tank loaded on a flat-bed trailer to a rig site in Ponchatoula, Louisiana. Plaintiffs shop foreman, George Hardy, drove another truck carrying a pump and a fuel tank to the site. The mud tank was secured to the trailer by means of chains locked by a clasp or binder. The binder had to be unfastened in order to unload the mud tank.
At the site, Lionel Lassange, an employee of “B & R”, climbed on the trailer bed in order to unfasten the binder. Lassange attempted to unsnap the binder by hand but could not release it, so he used plaintiffs cheater pipe to accomplish the task. A cheater pipe is a piece of iron frequently used when the chain is too tight to allow unsnapping the binder by hand. This one was approximately 5' long and in diameter. Lassange testified that while attempting to use the cheater pipe to unsnap the binder, the chain was so tight, “it threw the pipe away from me, and I couldn’t hold it. It just threw it out of my hands, and it went towards them, and it hit J.B. upside the head.” At the time, plaintiff was standing on the ground some ten feet away from where Lassange was working. He was not wearing a hard hat and the blow from the flying cheater pipe knocked him to the ground. Plaintiff testified that the accident rendered him unconscious and that he bit his tongue. He was taken to the emergency room at the General Hospital in Hammond by Fred Booksh, a superintendent for “B & R.” There, he received 12 stitches for his lacerated forehead and medication for his cut tongue. Plaintiff then returned to the well site and drove the truck back to his employer’s headquarters in Port Barre, Louisiana.
On the following Monday, January 16, 1984, plaintiff saw his personal physician, Dr. Glynn Granger, who determined that the head wound was healing quite well. Plaintiff returned to work the following day. On January 23, 1984, Dr. Granger again checked the head wound, and found that it had completely healed. However, plaintiff returned to Dr. Granger on February 3, 1984, complaining of headaches and a sore on his tongue. He went to see the doctor again on April 27, 1984, at which time plaintiff was still having headaches and his tongue, although better, had not healed. Plaintiff did not visit Dr. Granger again until September 4, 1984. Dr. Gran-ger informed the plaintiff that, as the sore on his tongue still had not fully healed, he was concerned that it might be cancerous. He advised that the lesion be removed. Dr. Granger performed this surgery on September 17, 1984. The biopsy of the lesion showed that it was not cancerous.
Plaintiff visited Dr. Granger on several occasions in October, complaining of headaches, ringing in his ears, and sexual impotency. On December 5,1984, plaintiff was hospitalized for depression and a severe nervous attack. At that stage, plaintiff saw three psychiatrists: Dr. Philip A. Landry, Dr. Clayton B. Edisen, and Dr. James Howell Blackburn. Plaintiff’s complaints persisted and he also developed an ulcer in 1986.
ALLOCATION OF FAULT
LSA-C.C. art. 2315 is the basis of the law of negligence in Louisiana. It states in pertinent part:
*629 “Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.”
In determining whether liability exists under the facts of a given case, Louisiana courts have employed a “duty-risk” analysis. Dixie Drive It Yourself System, Inc., v. American Beverage Co., 242 La. 471, 137 So.2d 298 (1962). In making the requisite analysis four questions are to be considered:
1. Was the conduct in question a cause-in-fact of the resulting harm?
2. What, if any, duties were owed by the respective parties?
3. Were the requisite duties breached?
4. Was the risk, and harm caused, within the scope of protection afforded by the duty breached?
Mart v. Hill, 505 So.2d 1120 (La.1987); Pierre v. Allstate Insurance Co., 257 La. 471, 242 So.2d 821 (1970).
The initial inquiry in any duty-risk analysis involves causation. There must be a causal relationship between the defendant’s alleged conduct and the harm to the plaintiff. Hill v. Lundin and Associates, Inc., 260 La. 542, 256 So.2d 620 (1972); Silliker v. St. Landry Police Jury, 520 So.2d 880 (La.App. 3d Cir.1987). In the instant case, the action of “B & R’s” employee, Las-sange, in letting go of the cheater pipe was indeed a cause in fact of the resulting harm.
The duty issue is a policy inquiry into whether the defendant’s duty to the victim included protection against the particular injury. Sibley v. Gifford Hill and Co., Inc., 475 So.2d 315 (La.1985). We find that “B & R’s” employee owed plaintiff a duty to exercise ordinary care in using the cheater pipe to unfasten the binder. By letting go of the cheater pipe, he breached the standard of conduct ordinarily expected under the circumstances. Furthermore, he should have reasonably foreseen that, as a result of his action, some such injury as plaintiff suffered might occur. Thus, we conclude that the jury was correct in finding negligence on the part of “B & R’s” employee.
Turning to an analysis of plaintiff's actions, plaintiff argues that the jury erred in finding that his conduct contributed to the accident. Plaintiff admits that he was not wearing a hard hat at the time of the accident. However, he claims that he was not required to do so by his employer because there was no overhead construction at the Ponchatoula site. Thus, plaintiff contends that his failure to wear a hard hat when it was not required does not constitute negligence on plaintiff’s part which contributed to his injuries.
Plaintiff’s argument fails to take into account his other actions which support a finding of negligent conduct on his part. For example, plaintiff knew that Lassange was using a cheater pipe to unfasten the binder and he was also aware that there might be a risk associated with this activity. Yet, plaintiff testified that he was not watching while the “B & R” employee attempted to unsnap the binder, but was walking back to the truck when he was hit by the cheater pipe and knocked to the ground. Plaintiff’s inadvertence in this regard was a cause-in-fact of the accident. If plaintiff had exercised more care, he might have avoided the accident altogether. Furthermore, by not adequately protecting himself against this reasonably foreseeable hazard, plaintiff’s conduct fell below the standard to which he should conform for his own protection.
Having found both parties negligent, we turn to the matter of apportionment of fault. First, we note that upon appellate review, Louisiana courts have jurisdiction with regard to both law and facts. La. Const. art. V. § 10(B). This standard of appellate review was not meant to be applied so as to require upholding a trial court ruling simply “when the evidence before the trier of fact furnishes a reasonable basis for its finding.” Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978). Rather, a trial court’s factual finding should be upheld “in the absence of manifest error." Id. Manifest error means, in its simplest terms, clearly wrong.
In the instant case, considering all of the evidence, we find that the jury was clearly *630 wrong in assessing 90% of the fault to the plaintiff. In Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967, 973-4 (La.1985), the Louisiana Supreme Court set forth guidelines in apportioning comparative fault. It stated:
“We recognize that a standard for determining percentages of fault has not been provided by the Legislature, and we are therefore presented with an opportunity to offer guidelines as we apportion fault in this instance. In so doing we have looked to the Uniform Comparative Fault Act, 2(b) and Comment (as revised in 1979), which incorporates direction for the trier of fact. Section 2(b) provides:
In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed.
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.” (footnotes omitted)
In Turner v. New Orleans Public Service, Inc., 476 So.2d 800, 805 (La.1985) (Justice Lemmon, concurring), Justice Lemmon noted that proportionate percentages of fault should be based on considerations of the parties’ respective degrees of causation and duty.
Our consideration of the foregoing factors leads us to conclude that the majority of the fault must rest with defendant’s employee rather than with the plaintiff. Obviously, there is a clear causal connection between the “B & R’s” employee’s action in letting the cheater pipe out of his grasp and the plaintiff’s injury. On the other hand, plaintiff's failure to be more attentive or to wear a hard hat were not as directly related to the accident.
The conduct of “B & R’s” employee was also far more egregious than plaintiff’s conduct. As an experienced oil field worker who regularly assisted plaintiff in unloading equipment, he had to be aware that if he did not exercise ordinary care in using the cheater pipe to unfasten the binder, the tool might fall out of his grasp and injure a worker on the ground. By contrast, plaintiff’s action in failing to look while Las-sange worked to unfasten the binder, was inadvertent. Furthermore, the risk created by Lassange’s negligence could have resulted in an even more serious accident.
Thus, the Watson factors require a reapportionment of these parties’ fault. We conclude that the degree of fault assigned to plaintiff can be no more than 25% with the balance of 75% assigned to defendant.
DAMAGES
On appeal, plaintiff contends that the jury erred in finding that he sustained damages of $5,000.00 for past pain and suffering as a result of the injuries suffered in the accident. Specifically, plaintiff submits that the award does not adequately compensate him for his headaches, his fear that the lesion on his tongue might be cancerous, and his sexual impotence. We disagree.
The plaintiff has the burden of proving by a preponderance of the evidence a causal connection between the accident and the injuries claimed. Whether or not this burden has been sustained is a question for the trier of fact. Its findings will not be disturbed on appeal unless clearly wrong. Edwards v. Bankers and Shippers Inc. Co. of New York, 432 So.2d 1138 (La.App. 3rd Cir.1983). Furthermore, in Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976), the Supreme Court has stated that before an appellate court can disturb a quantum award, the record must *631 clearly reveal that the trier of fact abused its much discretion in making the award. In determining whether the trial court has abused its discretion in determining the amount of the award, the appellate court must look first, not to prior awards, but to the individual circumstances of the case before it. Reck v. Stevens, 373 So.2d 498 (La.1979).
After carefully reviewing the record, we cannot say that the jury abused its much discretion in not awarding greater damages to the plaintiff. Plaintiff’s injury occurred on a January 13,1984. Thereafter, on January 17,1984, plaintiff returned to work as a truck driver. He worked seven hours that day, fourteen hours on January 18th and thirteen hours on January 19th. Plaintiff continued working normal hours as a truck driver until his wife entered the hospital in the latter part of April. She underwent surgery to remove a cancerous cyst from her colon and remained hospitalized for one month and seventeen days. Between the latter part of April and the beginning of May, plaintiff was charged with a DWI, as a result of which he lost his driver’s license for ninety days. Plaintiff worked for Sam Grimmett, Inc., on a full-time basis as a helper until September of 1984 when he was hospitalized for the infection to his tongue.
From April 27th to September 4, 1984, plaintiff did not see a doctor. In September of 1984, plaintiff visited Dr. Granger because his tongue had not healed and Dr. Granger informed the plaintiff that the lesion on his tongue should be removed. After the operation, plaintiff fully expected he was going to return to work as a truck driver. However, he was told by his employer that he was no longer insurable by Safeco because of the DWI charge against him. Plaintiff did not return to work for Sam Grimmett, Inc., because he refused to work in the yard as a helper. Subsequent to these events, plaintiff began experiencing anxiety or nervous attacks and his impotency problems started.
Plaintiff alleges that his sexual problem is causally related to the accident in question. However, there is ample evidence in the record to suggest that plaintiff’s dysfunction may have been due to his distress at no longer being able to earn his living as a truck driver because of the DWI charge. In addition, plaintiff told Dr. Landry that he had been an alcoholic. Dr. Blackburn testified that heavy drinking over a long period of time can cause impotency. However, plaintiff never saw a specialist for his sexual problem and was never tested to ascertain if the origin of the problem was physical rather than psychological.
With regard to plaintiff’s headaches, we observe that plaintiff first complained to Dr. Granger on February 3, 1984, of headaches, and that he still suffered from them through April. However, Dr. Granger made two appointments for plaintiff, one on May 15, and the other on July 27, which plaintiff failed to keep. Thus, it was not until some five months later on October 8, 1984, that plaintiff complained of headaches once again. Although Dr. Granger attributed these headaches to the accident, it was brought out in Dr. Edison’s testimony at trial that plaintiff had suffered from migraine headaches prior to the accident. Thus, it was certainly within the province of the jury to find either that plaintiff’s headaches were not as severe as he suggested, or were not all caused by the accident in question.
Turning to plaintiff’s alleged fear of having cancer, we find that there was sufficient evidence in the record to support the jury’s lack of an award for this complaint. Dr. Granger testified that he informed the plaintiff on three different occasions after the operation that plaintiff did not have cancer, but that the plaintiff did not believe him. In fact, the tongue ulcer was completely healed by October 31, 1984. However, Dr. Blackburn testified that “the missing element in documenting a cancer phobia is that, as far as I know, he didn’t return to Dr. Granger to seek other medical examinations to document in his own mind further that he may’ve still had cancer.” Furthermore, plaintiff testified that he did not seek a second opinion after Dr. Granger told him that there was absolutely no evidence of cancer on his tongue. Finally, Dr. Edisen testified that plaintiff did not *632 express any particular concerns about the possibility of cancerous growth when he examined the plaintiff in July of 1985.
Accordingly, after carefully reviewing the record, we cannot say that the jury abused its discretion in not awarding greater damages for the injury to plaintiff.
For the reasons assigned, we affirm the judgment of the trial court in part, amend it in part, and recast it to read as follows:
IT IS ORDERED, ADJUDGED, AND DECREED that there be and hereby is judgment in favor of Plaintiff, JOSEPH B. DOUCET and against Defendants, B & R PETROLEUM SERVICES, INC, and WESTERN EMPLOYERS INSURANCE COMPANY in the amount of THREE THOUSAND, SEVEN HUNDRED FIFTY ($3,750.00) DOLLARS, together with legal interest thereon from the date of judicial demand until paid.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that all costs of this appeal be assessed 75% against Defendants, B & R PETROULEUM SERVICES, INC., and WESTERN EMPLOYERS INSURANCE COMPANY, and 25% against Plaintiff, JOSEPH B. DOUCET.
AFFIRMED IN PART; AMENDED; AND AS AMENDED, AFFIRMED.

. On November 4, 1985, "B & R” filed a third party demand against Safeco and General Insurance Company of America seeking indemnity in the event "B & R” was found liable to the plaintiff. The third party petition of "B & R” against General Insurance Company of America was dismissed with prejudice on October 8, 1987.