571 So.2d 780 (1990)
William Lynn ANDERSON, et al., Plaintiff/Appellant,
v.
BENNETT WOOD FABRICATORS, et al., Defendant/Appellant.
No. 21997-CA.
Court of Appeal of Louisiana, Second Circuit.
December 5, 1990.
Rehearing Denied January 17, 1991.
Writ Denied January 31, 1991.
*781 Davenport, Files & Kelly by Thomas W. Davenport, Jr., Monroe, for defendant/appellant.
Travis M. Holley & Associates by Travis M. Holley, Bastrop, for plaintiff/appellant.
Crawford & Anzelmo by Donald J. Anzelmo, Monroe, for intervenor/appellee.
*782 Before FRED W. JONES, Jr., SEXTON and LINDSAY, JJ.
LINDSAY, Judge.
This suit arises from a work-related accident wherein the plaintiff, William Lynn Anderson, was struck by a forklift driven by an employee of the defendant, Bennett Wood Fabricators (hereinafter referred to as "Bennett"). A jury assessed comparative fault of 70% to Bennett and 30% to the plaintiff. The jury awarded special damages of $180,000 and general damages of $100,000. Bennett and its insurer appeal the judgment. They contest the degree of fault assessed to Bennett, and argue that the damages are excessive. The plaintiff also appeals, contending that the award of special damages is inadequate. For the reasons expressed herein, we affirm.

FACTS
On January 21, 1988, the plaintiff, a truck driver, drove to Bennett's premises in Bernice, Louisiana, to have his flatbed trailer loaded with pieces of particle board. During the course of the loading procedure, the plaintiff was struck by one of the two forklifts being operated at the time by Bennett's employees. The plaintiff testified that he was standing still, facing the front of the truck, when he heard a noise behind him. When he turned around, he was struck on his left side by bundles of wood being carried on the forklift. In contrast, Bennett's employees testified that the plaintiff had been strapping down his load when he suddenly took two steps backwards directly into the path of the forklift.
The plaintiff was knocked down on the cement loading dock. He was taken to the Tri-Ward Clinic in Bernice, where he was treated by Dr. Pam Hearn for an abrasion to his left forehead and a contusion to the left hand. His left thumb was x-rayed, but the findings were negative. His head wound was cleaned and dressed, and he was given Naprosyn, an anti-inflammatory drug for pain and inflammation.
Thereafter, the plaintiff returned to Bennett's establishment to get his truck. Instead of delivering the load, he took the truck to his employer's place of business and then went home. Later that day, he went to the Morehouse General Hospital emergency room. There he was treated for cervical muscle spasm and pain in the left shoulder and left thumb. He was thereafter treated by Dr. Michael Smith, a general practitioner.
The plaintiff first went to see Dr. Smith on January 22, 1988. Dr. Smith continued the Naprosyn and also gave him Tylenol with Codeine for pain.
On January 24, 1988, the plaintiff was admitted to Morehouse General Hospital for dizziness and nausea. He was diagnosed as having a concussion, a contusion to the left shoulder, bursitis of the left shoulder, and cervical muscle spasm. Prior to his discharge on January 27, 1988, Dr. Smith also noted "some muscle tightness" over "the trapazius muscle, left side of neck." The plaintiff was started on a program of physical therapy.
The plaintiff underwent regular out-patient physical therapy at the hospital from January 28, 1988, to March 11, 1988. However, the physical therapy records indicate that the plaintiff missed appointments on several occasions.
On March 21, 1988, Dr. Smith treated the plaintiff for a swollen right hand and knuckles. The plaintiff sustained these minor injuries while defending himself in a fight with a drunk at a convenience store.
Dr. Smith eventually referred him to Dr. Richard Nichols, an orthopedic surgeon in Bastrop, for consultation due to plaintiff's continued pain of the left shoulder and left thumb. In order to obtain a second opinion for his employer's worker's compensation insurer, the plaintiff was also seen by Dr. Frank X. Cline, an orthopedic surgeon in Monroe. The plaintiff saw both Dr. Cline and Dr. Nichols in April, 1988. All of the doctors agreed that the defendant had a "trigger thumb" condition in his left hand and an "impingement syndrome" in his left shoulder.
Plaintiff was admitted to St. Francis Medical Center in Monroe on May 25, 1988, *783 at which time Dr. Cline performed a partial acromionectony of the left shoulder and a trigger finger release on the plaintiff's left thumb. He was released from the hospital the next day. However, he was readmitted on May 28, 1988, because of pain and discomfort and remained hospitalized for two days.
In October, 1988, the plaintiff was referred by Dr. Cline to Dr. Don Irby, a neurosurgeon in Monroe, for neck pain. Dr. Irby had the plaintiff undergo a myelogram, a CT scan, an EMG test, nerve conduction tests, and a MRI study. A bulging C5-6 cervical disc was discovered. Plaintiff was again admitted to the hospital and Dr. Irby performed an anterior cervical diskectomy in January of 1989. Dr. Irby discharged the plaintiff from his care on March 21, 1989.
On June 13, 1988, the plaintiff and his wife had filed suit against Bennett, its insurer, Indiana Lumbermen's Mutual Insurance Company, and an unnamed employee of Bennett. (Mrs. Anderson later dismissed her claims.) The worker's compensation insurer of the plaintiff's employer, Anglo-American Insurance Company, intervened to recover its subrogation claim for medical expenses and disability benefits paid to or on behalf of Anderson. (Anglo-American Insurance Company was placed into liquidation in March of 1989, and the Louisiana Insurance Guaranty Association was later joined as an additional intervenor.)
A jury trial was held August 2-4, 1989. Expert medical testimony was given by video deposition by Dr. Cline, Dr. Nichols, and Dr. Irby. Among other witnesses, the plaintiff also presented the testimony of Dr. Smith and Dr. Charles Bettinger. Dr. Bettinger was accepted as an expert in the field of economics and testified as to the plaintiff's economic losses due to his injury. Linda Ellis Darphin, the director of the Occupational Performance Center in Baton Rouge, Louisiana, testified as an expert in physical therapy. Also testifying was Robert O. Warrington, who was accepted as an expert in the field of mechanical engineering. Among the witnesses for the defense were Alan Bennett and his employees, Eddie Wayne Horton and Tommy Michelli. Michelli was the operator of the forklift which struck the plaintiff; Horton was a witness to the accident.
On August 4, 1989, the jury returned a special verdict, which found the employees of Bennett to be negligent and that their negligence was a cause of the injuries sustained by the plaintiff. The jury awarded special damages of $180,000 and general damages of $100,000. However, the jury further found that the plaintiff was himself negligent and that his negligence was likewise a cause of his injuries. Fault was assessed at 70% to Bennett and 30% to the plaintiff. Judgment in conformity with this verdict was signed on September 6, 1989.
Bennett and Indiana Lumbermen's Mutual Insurance Company appealed from this judgment. They assign as error the following: (1) the jury erred in assessing fault of 70% to Bennett and only 30% to the plaintiff; and (2) the jury erred in awarding excessive damages.
The plaintiff also appealed from the trial court judgment. The plaintiff contended that the special damages awarded by the jury are inadequate.

COMPARATIVE NEGLIGENCE
The defendants argue that the jury committed manifest error in finding Bennett's employees negligent. They contend that the plaintiff was not a credible witness and that the jury should have accepted the version of the accident recounted by the forklift operators, thus finding the plaintiff 100% at fault. They maintain that an assessment of 70% fault to Bennett's employees was inappropriate because the plaintiff's actions in taking two steps backwards into the path of the forklift made the accident unavoidable.
It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is a conflict in the testimony, reasonable evaluations of credibility *784 and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Rosell v. ESCO, 549 So.2d 840 (La.1989). Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. In applying the manifestly erroneousclearly wrong standard to the findings below, appellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo. Rosell, supra.
When factual findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's finding; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Rosell, supra.
Allocation of fault is a factual finding which an appellate court does not disturb unless, upon articulated and detailed analysis and reasons, that finding is demonstrated to be clearly wrong. Nichols v. Stone Container Corporation, 552 So.2d 688 (La.App. 2d Cir.1989), writ denied 556 So.2d 1262 (La.1990).
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, whether superior or inferior; and (5) any extenuating circumstances which might require the actor to proceed in haste without proper thought. Watson v. State Farm Fire and Casualty Insurance Company, 469 So.2d 967 (La. 1985); Nichols, supra.
Furthermore, in determining comparative fault, the greater the risk of harm to others, the greater is the fault. Turner v. New Orleans Public Service, Inc., 476 So.2d 800 (La.1985); Nichols, supra.
Our careful examination of the record leads us to conclude that the jury accepted plaintiff's version of the accident rather than the version outlined by Bennett's employees. The jury obviously made a credibility determination in the plaintiff's favor. Based upon the record before us, we find no manifest error in this determination. The evidence supports a finding that plaintiff was struck on the left side by the forklift and thus injured.
We find that the jury's assessment of fault is well supported under this scenario. In accepting the plaintiff's account of the accident, the jury could have found him to be 30% at fault for his inattentiveness in standing with his back to a forklift he knew to be in operation. At oral argument, plaintiff's counsel acknowledged that he had suggested to the jury that an assessment of 25% fault against the plaintiff would be acceptable. The assessment of 70% fault against Bennett's employees is fully supported under the plaintiff's version of the accident because of the forklift operator's failure to observe his proximity to the plaintiff. As he was in operation of a heavy piece of machinery capable of inflicting great bodily harm or death upon a bystander, the operator's negligence presented a substantial risk to others. To the contrary, the plaintiff's inattentiveness endangered only himself.
The plaintiff must accept responsibility for his own actions and an assessment of fault for his lack of attention. However, the defendants must likewise accept an assessment of fault for the forklift operator's *785 lack of safe operation of a potentially dangerous piece of heavy machinery. This is not a pedestrian-car accident, but a situation arising from employees working together in relatively close proximity at a work site. The risk to others presented by Bennett's employees' improper operation of the forklift is much greater than the actions of the plaintiff. Thus, we find no manifest error in the jury's assessment of 70% fault to defendants.
This assignment of error is without merit.

DAMAGES

Special Damages
The defendants argue that the jury award of $180,000 in special damages is excessive and speculative. Specifically, they contend that it is questionable as to whether the plaintiff's injuries were related to the accident, and that the plaintiff has suffered no significant disability preventing him from returning to comparable work.
To the contrary, the plaintiff argues that the amount of $180,000 is inadequate because it includes $28,669.44 in stipulated past medical expenses and only about $150,000 for past and future loss of wages. Dr. Bettinger, the plaintiff's economist and the only expert witness to address this issue, estimated that the plaintiff had suffered past lost wages of $30,477, and that he would suffer future wage losses of $274,184, or a total of $304,661.
The medical evidence amply demonstrates that the plaintiff sustained a left trigger thumb condition and an impingement syndrome of the left shoulder. While Dr. Nichols and Dr. Cline testified that these conditions were frequently caused by repetition, neither could exclude a single trauma (such as the accident) as the cause. Dr. Cline testified that if the plaintiff suffered any permanent disability attributable to the shoulder surgery it would be 10% disability of the left arm because of the scarring attendant upon surgery. However, he stated that under the AMA standards, the plaintiff would not be assessed any disability because he had full range of motion.
Dr. Nichols testified that he related the plaintiff's thumb and shoulder injuries to the accident based upon the history given by the plaintiff. Dr. Irby likewise related the plaintiff's disc injury to the accident based upon the history related by the plaintiff. He stated that the ligament could have been weakened or torn at that time, and that the disc began to protrude in a gradual process thereafter. When Dr. Irby removed the disc in December of 1988, he examined the material around it and found its condition to be compatible to an injury in January, 1988. However, Dr. Irby acknowledged that the material could also have been compatible with a more recent injury.
The defendants attacked the plaintiff's credibility and argued that the history he recounted to the doctors is suspect because he allegedly lied to several of them about seeing a doctor in Arkansas who susposedly advised him that he required surgery. They further questioned his credibility because he skipped physical therapy sessions to go fishing and engaged in a fistic encounter in March of 1988. However, we note that, even if the plaintiff lied about seeing another doctor, his strong suspicions about a neck injury and the need for further surgery were supported by the results of Dr. Irby's tests. Also, the plaintiff admitted missing some of the painful physical therapy sessions in favor of fishing, but on one occasion he was apparently teasing the therapist when he told her that he had gone fishing. As to the fistic encounter, the plaintiff was apparently acting in self defense. Also, there is no evidence to indicate that the incident caused his disc injury. Furthermore, all of the doctors considered the plaintiff to be sincere and truthful.
Consequently, we find no error in the jury's determination that the plaintiff's injuries were related to the January 21, 1988, accident. Now we must consider the extent of the plaintiff's resulting disability and his loss of wages.
*786 Awards for loss of future income are inherently speculative and are intrinsically insusceptible of being calculated with mathematical certainty. Thus, the courts must exercise sound judicial discretion in determining these awards, and render awards which are consistent with the record and which work an injustice on neither party. Morgan v. Willis-Knighton Medical Center, 456 So.2d 650 (La.App. 2d Cir.1984).
Factors to consider in determining loss of future income include the plaintiff's physical condition before and after his injury; his past work record and the consistency thereof; the amount the plaintiff probably would have earned absent the injury complained of; and the probability he would have continued to earn wages over the balance of his working life. A loss of future income award is not merely predicated upon the difference between the plaintiff's earnings before and after a disabling injury. Such an award is predicated, more strictly considered, upon the difference between a plaintiff's earning capacity before and after a disabling injury. Morgan, supra.
Uncontradicted expert testimony regarding the underlying facts is not binding on the court, but may not be lightly disregarded by the judge. Morvant v. Smith, 463 So.2d 75 (La.App. 3rd Cir.1985); Matthias v. Brown, 551 So.2d 821 (La.App. 3rd Cir.1989), writ denied 556 So.2d 1263 (La.1990).
The jury award of $180,000 includes the plaintiff's stipulated medical bills of $28,669.44. Thus, the remaining amount of $151,330.56 includes the award for both past and future loss of wages.
Dr. Bettinger's uncontradicted testimony established that from the accident to the date of trial the plaintiff had past lost wages of $30,477. Thus, this would leave an award of only $120,853.56 for future loss of wages, or about 44% of the amount suggested by Dr. Bettinger. Therefore, we must determine whether this award was an abuse of discretion by the jury. In order to do so, it is helpful to review the testimony of the medical witnesses and that of the economist.
Dr. Cline testified that when he last saw the plaintiff in October of 1988 he felt that the plaintiff could return to his previous employment as a truck driver. The doctor said he would assess only a 10% disability of the left arm. However, he conceded that he would defer to the judgment of any other doctor who had examined the plaintiff more recently.
Dr. Irby last examined the plaintiff on March 21, 1989. He felt that the plaintiff had made good progress since his surgery. However, he assigned to the plaintiff a permanent partial disability of 15% to the body as a whole based upon AMA guidelines. Dr. Irby felt that the plaintiff could resume work as a truck driver if he could avoid loading or unloading. Dr. Irby suggested that the plaintiff participate in a vocational rehabilitation program because he felt that the plaintiff should avoid heavy lifting involving the upper body, excessive neck stress, and any sudden moves of the head and neck. He thought that the plaintiff might be able to work as a welder, for which he had some training.
Ms. Darphin, the director of the Occupational Performance Center in Baton Rouge, testified as an expert in physical therapy. She evaluated the plaintiff on July 24 and 25, 1989. Tests were conducted over a two-day period in sessions of three to four hours. Ms. Darphin testified that the plaintiff put forth "a very good effort" on the tests. Generally, the plaintiff's deficiencies were a decrease in upper extremity strength and endurance, as well as cervical and left shoulder discomfort. He was able to rate 50 pounds occasionally and 35 pounds frequently on the tests for horizontal lifting and carrying (both hands and right hand). On the lifting from waist to shoulder test, his maximum performance was 35 pounds occasionally. His ability to work overhead was limited because of decreased left shoulder strength and discomfort. Based upon his performance and history, she concluded that the plaintiff was capable of only a medium level of work, which is defined as being able to lift 50 *787 pounds infrequently and 25 pounds or less frequently. She noted exceptional difficulty for the plaintiff in overhead work.
Ms. Darphin concluded that the plaintiff could not return to his previous employment as a truck driver because it involved lifting more than 50 pounds. (The tarpaulin which he was required to put over his loads weighed 100 pounds) She did feel he was capable of short haul driving. His ability to work as a mechanic would depend upon whether he was required to lie on his back to work overhead. She said he would probably do well if he didn't have to lift over 50 pounds or if he was leaning over a car to work on it. She also felt he could work as a shop welder, but was dubious that he could perform structural welding.
As previously noted, Dr. Bettinger calculated the plaintiff had sustained past loss of earning capacity of $30,477 between the time of the accident and trial. He determined this amount by multiplying the plaintiff's average weekly wage by 79.7 weeks, the length of time since the accident. To calculate the plaintiff's future loss of wages, he utilized the amount the plaintiff would earn as a deputy sheriff, a job the plaintiff had already secured. He then established the difference between that amount and the amount the plaintiff would have allegedly made as a truck driver. Dr. Bettinger determined that the difference would be $10,101 annually. Utilizing this basic method, Dr. Bettinger established that over a period of 29.2 years (the expected work life for the plaintiff) the plaintiff would sustained total lost wages of $274,184.
However, on cross-examination Dr. Bettinger calculated that the plaintiff's average annual income over a six-year period preceding the accident was only slightly more than $10,000, not including any inflationary factor. Dr. Bettinger also conceded that if the plaintiff obtained employment as a mechanic, a welder, or as an air conditioning and refrigerator repairman (all occupations for which the plaintiff had training), he would suffer little or no future economic loss. The economist also testified that he was aware that some trucking companies do not require drivers to load or unload cargos, and that there was no significant difference in the amount paid to such drivers.
Based upon the foregoing, we find that the trial jury's award, while perhaps low, was not an abuse of discretion. The testimony of the witnesses did not establish the plaintiff's inability to secure more lucrative employment than that of a deputy sheriff. The evidence demonstrates that he is able to pursue other employment, such as short haul truck driving and shop welding, occupations in which he would suffer a substantially less drastic economic loss.
Based upon the foregoing, we find no abuse in the jury's award of $180,000 in special damages.

General Damages
The plaintiffs contend that the jury award of $100,000 in general damages is excessive and speculative. The plaintiff makes no complaint about the amount of this award.
The trial court or jury is given much discretion in an award of general damages, and an appellate court must find that the trial court or jury abused its discretion before an award may be modified. Upon modification, the appellate court is only vested with authority to lower or raise the amount to the highest or lowest point which is reasonably within the discretion of the lower court. Spangler v. North Star Drilling Company, 552 So.2d 673 (La.App. 2d Cir.1989).
General damages are those which may not be fixed with pecuniary exactitude. They instead involve mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or lifestyle which cannot be definitively measured in monetary terms. Morgan, supra.
In assessing the plaintiff's award for general damages, we have considered the following factors. As a result of his injuries, the plaintiff suffered considerable pain as demonstrated by the necessity for pain medication. He underwent two separate *788 surgeries and required several hospitalizations as a result of injuries sustained in the accident. He underwent a myelogram, a CT scan, an EMG, and a MRI study. His injuries have restricted the recreational activities of this 30-year-old married plaintiff with three children. He has been forced to abandon certain hobbies such as skiing. He has also suffered certain emotional stresses resulting from the financial situation brought on by the injury. In order to make ends meet, the plaintiff and his family were forced to sell several items including furniture, a boat and power tools.
Consequently, we cannot say that the award of $100,000 to this plaintiff who has undergone two surgeries, several hospitalizations, and numerous diagnostic tests is excessive.
This assignment of error is without merit.

CONCLUSION
Based on the foregoing, the judgment of the trial court is affirmed. Costs are assessed to the parties in the amount of their respective percentages of fault.
AFFIRMED.

APPLICATION FOR REHEARING
Before SEXTON, NORRIS, LINDSAY, HIGHTOWER and FRED W. JONES, JJ.
Rehearing denied.