WICKER, Judge.
This appeal arises from a suit for damages filed on behalf of Dr. Koleman Finkel-stein (Dr. Finkelstein) and Danica Thomas Finkelstein (Danica) against Velis Pena (Pena), Pena’s insurer Old Hickory Insurance Company (Hickory) and The Prudential Insurance Company (Prudential), Dr. Finkelstein’s uninsured/underinsured motorist insurer. After a jury trial, judgment was rendered in favor of Danica in the amount of $2,500.00 and Dr. Finkelstein in *1023 the amount of $5,000.00 against Pena and Hickory. Judgment was also rendered in favor of Prudential and against Pena and Hickory on Prudential's reconventional demand in the amount of $1,022.00. In addition, all claims against Prudential were dismissed with prejudice. Pena and Hickory were further cast for costs, expert fees, and interest. Only Dr. Finkelstein and Da-nica appeal the judgment. We revise in part and as revised, affirm.
Dr. Finkelstein and his wife, Danica allege they suffered injuries in an automobile accident on January 13, 1985.
The jury found Pena to be 100% at fault and awarded damages. Plaintiffs/appellants have appealed the damage award by raising the following specifications of error:
1. The trial court erred in excluding as hearsay, evidence relating to Dr. Sobo-loff, and
2. The jury, after finding liability, erred in awarding the amount of damages.
In their first specification appellants assert that the trial court erred in excluding all testimony related to Dr. Soboloff s reports. Dr. Soboloff is now deceased. However, we find no objection in the record to such exclusion and no request for a proffer of the excluded testimony. In McLean v. Hunter, 495 So.2d 1298 (La.1986) the Louisiana Supreme Court held “[without a proffer, appellate courts have no way of ascertaining the nature of the excluded testimony.” Id. at 1305. We follow the holding in McLean and conclude that since appellants did not object or proffer the excluded testimony they are precluded from asserting the exclusion as error on appeal. La.C.C.P. art. 1636.
Dr. Finkelstein and Danica further complain that the jury abused its discretion in awarding general damages. Dr. Finkel-stein argues that the testimony reflects he suffered a neck injury of several months duration as well as a herniated disc. He contends that the disc problem will last five to seven years with continual occasional pain and stiffness thereafter. He complains the jury erred as this testimony was unrefuted.
Danica also complains of an abuse of discretion. She argues the jury failed to take into account the length and severity of problems associated with her injuries.
Only the plaintiffs/appellants introduced expert witnesses to testify regarding their injuries. The two experts were Dr. Russell Grunsten, an orthopedic surgeon, and Dr. Gary F. Carroll, a specialist in internal medicine and general practice.
DANICA:
Dr. Grunsten testified as follows regarding Danica's injuries: He first treated her on August 5, 1987 for injuries she sustained in the accident of January 13, 1985. Although she was not actually seen by him before 1987, she had been seen by other associates of his in the same office. Both Dr. Marcus and Dr. Soboloff had seen her previously.
He reviewed the records of Dr. Marcus and Dr. Soboloff, examined her and took a history in order to form an opinion. Dr. Marcus’s and Dr. Soboloff s reports clearly state she did have a neck injury. Dr. Sobo-loff last saw her September 5, 1986.
Danica related to Dr. Grunsten that she was a passenger in the right front seat of a slow moving vehicle when it was struck from the rear by another vehicle. She reported she had a bruise and soreness in the left elbow and that two or three days following the accident she saw Dr. Carroll. She related Dr. Carroll prescribed medication and ultrasound treatments.
She further stated that three weeks later she developed headaches, nausea and vomiting and was seen at Touro Infirmary’s emergency room. She wore a neck collar and continued ultrasound treatments for a total of six months.
One year before his examination of August 5, 1987 she reported that she became symptom-free of neck discomfort. The only headache she had during the prior one-year period she attributed to sinus and not to the accident. She gave no history of a second injury following the accident.
He stated:
*1024 It is my opinion that this patient had apparently sustained contusions of the left elbow, a sprain of the neck region in association with the rear end automobile accident in January of 1985 ... the CT Scan revealed some minimum bulging of the disc in the lower back, and it’s about what we expect in an average person who’s 30 to 50 years of age ... we expect some bulging to be manifested. There was no evidence of disc herniation
[[Image here]]
He felt she had a minor injury to the left elbow and a soft tissue injury of her neck as a result of the accident. He did not believe the minimal disc bulging to be a consequence of that accident. Although he found certain symptoms attributed to her lower back (e.g. urinary frequency) he had no explanation for these and disagreed with a neurologist who diagnosed her as having multiple sclerosis.
Therefore, according to Dr. Grunsten’s testimony, Danica did not become symptom-free of neck problems until August 5, 1986. Also, Dr. Soboloff last saw her September 5, 1986. Since the accident occurred on January 13, 1985 she was under the care of a physician for almost nineteen months following the accident before she became symptom-free of neck pain.
Dr. Carroll testified as follows: He first treated Danica on January 14, 1985. She described the accident and stated she was thrown forward and backward. She reported stiffness in the left elbow and pain in the left shoulder and left side of her lower back. On examination he noted tenderness in the neck and spasm on rotation.
He saw a contusion or bruise of the left elbow. She experienced pain in the area as well as spasms of the muscles. He further found tenderness in the back. His diagnosis at the time was “muscular ligamentous injuries involving the left trapezius and thoracic spine and a contusion of the left elbow.” He prescribed warm soaks at home, medication and therapy twice a week.
He saw her a total of eight times from January 14,1985 through January 17,1986. On January 25, 1985 there was no significant change in the physical examination. She started showing improvement on February 20, 1985 when he noted decreased tenderness and muscle spasm with a range of motion that was closer to normal.
On March 15, 1985 he found that the left elbow and back were negative on the physical exam. However, he found tenderness in the neck with pain and spasm on range of motion. Her examination was normal on April 26, 1985 although she still complained of stiffness and soreness. She continued to complain of intermittent pain and stiffness with her neck on May 81,1985 but reported no problems with the back or left elbow. On May 31, 1985 the examination was again negative.
On June 28, 1985 the exam was negative although she reported problems with her neck. At that time she was undergoing ultrasound treatments and using wet hot soaks at home.
Danica was seen by one of his associates on August 2, 1985 who reported that she had no pain in her elbow or back. However, although her neck was improved, pain was elicited at extreme motion.
Dr. Carroll last examined her on January 17, 1986. At that time she stated that she had increased problems with her neck and headaches. On that occasion she did have physical findings related to her neck. He recommended aspirin, wet soaks and a return visit of February 14, 1986. She did not return.
He explained that problems with a muscle injury ebb and flow and that Danica’s waxing and waning in this regard was normal for this type of injury.
Dr. Carroll diagnosed her as having a strain of the neck and mid spine as well as a contusion of the elbow, and post traumatic headaches. He attributed these problems to the accident. Danica never complained of her low back. He did not note any vomiting or nausea to be caused by the accident.
Therefore, Dr. Carroll treated Danica for injuries related to the accident for one year during which her symptoms related to her *1025 neck waxed and waned. She had physical findings relative to her neck one year following the accident and had not yet been released from his care.
He reported negative physical findings regarding her left elbow and back two months after treatment.
Danica testified as follows: She was in good health before the accident and had never experienced physical problems with her back or neck prior to that date. She experienced a bruised elbow and aching in her shoulders and back following the accident.
She had to use a heating pad at work on her shoulder and neck area for a period of three or four months on a consistent basis. Following that period her use of the pad has been occasional up to the date of trial of March 22, 1988.
Approximately three weeks after she first saw Dr. Carroll she experienced severe pain in her head and neck and went to Touro Infirmary’s emergency room. They gave her a neck brace and medication. Dr. Marcus saw her on a follow-up visit from the emergency room. Dr. Marcus recommended physical therapy but as the place held inconvenient hours she returned to Dr. Carroll to undergo physical therapy.
During the Summer of 1985 her problems improved but there would still be an occasional flaring up of the symptoms. In the Summer of 1985 she still underwent physical therapy. She testified that she went to physical therapy five times in April 1985 and four times after her marriage to Dr. Finkelstein. She and Dr. Finkelstein married in May 1985.
She also stated she slept on a moist heating pad for over a year. Once her elbow got better it never bothered her; however, her problems with her neck and back would come and go.
She stated she had no other accident or injuries although she admitted to slipping and hitting her elbow on one occasion.
DR. FINKELSTEIN:
Dr. Grunsten also saw Dr. Finkelstein. He testified that Dr. Finkelstein had also seen his partner, Dr. Soboloff from May 10, 1985 through August 1, 1986.
Dr. Grunsten first saw Dr. Finkelstein on December 4, 1986. He was still under his care at the time of trial on March 21, 1988. Dr. Finkelstein received physical therapy on February 18,1988. When Dr. Grunsten first saw him in December 1986 Dr. Finkel-stein reported that his neck symptoms had cleared up for several months. Dr. Grun-sten believed that as a result of the accident:
he sustained a ruptured disc in the lower part of his back on the left side between L-5 and S-l as has been demonstrated both historically by symptomology that he has incurred as a consequence of this accident, by neurological evaluations, which have demonstrated an alteration and reflex response in his left leg, by a CAT Scan which clearly shows a ruptured disc ... on the left side at L-5, S-l
[[Image here]]
* * * * * *
there isn’t any question in my mind that this man has had a ruptured disc.
When questioned about his basis for concluding Dr. Finkelstein had a ruptured disc as the result of the accident, he explained:
I have one history of an injury mechanism, an auto accident. He’s questioned about interval injuries, has anything happened to you since that time, there’s no history of anything happening from that date up to the present time that would logically account for a ruptured disc ... I have only one thing to relate to it, the auto accident.
Dr. Grunsten further explained that he considered significant the following:
the fact that he had symptoms involving his left side, had difficulty bending the left side shortly after this accident took place, that he would have recurrent episodes of difficulty in the lower back that have had definitive positive physical findings associated with them and that in support of this you have a CAT scan which clearly shows evidence that there *1026 is a disc extrusion into an area where it doesn’t belong [Emphasis added].
* * * # * *
He’s had pain in his low back as a predominate problem and the initial part of the low back symptomology which was left sided and he had difficulty bending to the left side, that’s the reason I believe that the ruptured disc on the left side is the consequence of this accident because of this history, the whole thing fits into one relatively neat picture.
80% to 90% of ruptured discs can be treated without surgery and Dr. Finkel-stein’s response to treatment has been satisfactory although he has periods of discomfort. “It may take two, three or four years before [Dr. Finkelstein’s disc condition] just burns itself out and becomes a relative symptom free situation.”
As a result of his disc condition, his motion is restricted. Dr. Grunsten cautioned Dr. Finkelstein not to play tennis vigorously. He told him not to create inordinate stress to his back by participating in athletic activities.
On February 9, 1988 Dr. Finkelstein saw Dr. Grunsten following a second automobile accident occurring on February 4, 1988 from which he experienced pain in the low back area. Dr. Grunsten stated, however, that the diagnosis of ruptured disc was made long before the February 1988 accident. When questioned about his bill, he replied that the last visit was not for the January accident.
Dr. Carroll also saw Dr. Finkelstein. He first saw him on January 14, 1985. Dr. Finkelstein reported no accident or injuries in the past. He complained of stiffness in the back and headaches on that occasion.
On examination, Dr. Carroll found tenderness and spasm in the neck with pain elicited. There was also moderate tenderness in the back with pain and spasm. He prescribed medication, warm soaks and ultrasound therapy.
On January 30, 1985 Dr. Carroll again saw Dr. Finkelstein. His examination showed no change. He continued to complain of stiffness in the back and neck. On the next visit of February 27, 1985 there was slight improvement in the neck but the back was still causing significant problems. His physical exam was unchanged on March 27, 1985. Therapy was continued.
On May 6, 1985 Dr. Carroll noted considerable tenderness in the area of T-10 through L-3. Medication and continued therapy were recommended. Two days later Dr. Finkelstein returned to report considerable problems. His exam was unchanged and a referral was made to Dr. Soboloff. He saw Dr. Soboloff for one and one-half years. Dr. Carroll stated that his situation worsened without any intervening history of injury. Both Dr. Soboloff and Dr. Carroll prescribed therapy and exercises.
On his next visit of June 26, 1985 his exam was still unchanged. On August 14, 1985 he had physical findings for both his neck and back but his back had improved.
Although his neurological examination was always negative this did not mean he did not have a herniated disc, it meant only that no emergency surgery was needed. His x-rays showed a pre-existing degenerative disc disease which means he does not resolve problems as quickly as those without that condition.
Dr. Finkelstein testified he was driving the car when he was jerked in the accident. He gave inconsistent testimony regarding his health prior to the January accident. He stated he was in good health before the incident and had never had neck or back problems, however, he also admitted that he made a claim for personal injuries in the late 1970’s for injuries he believed were on the right side of his body. He did not recall whether he advised Dr. Carroll or Dr. Grunsten of the earlier accident or injury. He stated he recovered fully from that accident and described it as “minor.”
As a result of the January accident at issue, he has had neck and lower back pain. His neck problems persisted from January 1985 to May 1985. There was a sudden onset of neck problems in August 1985. Since August 1985 there have been no further problems with his neck.
*1027 The diagnosis of ruptured disc was made in July 1987. Dr. Soboloff had diagnosed him as having spasms and strains as the result of the January accident. Prior to July 1987 he continued to play tennis although on a more limited basis. He limited his tennis activity due to pain.
After the recent accident of February 4, 1988 his back hurts even more.
QUANTUM: DANICA
The testimony at trial is uncontro-verted that Danica sustained a minor injury from the accident to her left elbow, eliciting physical findings on examination for approximately two months following the accident. It is also undisputed that she sustained a soft tissue injury to her neck and back as a result of the accident. The back injury showed physical findings on examination for approximately two months after the accident. Her neck injury showed physical findings on examination approximately one year after the accident.
The jury awarded Danica a total of $2,500.00 which included the special damages of medical expenses. Appellant suggests that the jury awarded a total of $1,867.15 for special damages leaving only $632.85 for general damages. Appellee correctly points out that Dr. Grunsten treated Danica for symptoms of her lower back which he did not attribute to the accident. Neither the bill nor his testimony separate the injuries.
The only medical bills proven at trial to be related to the accident were the Touro bill and Dr. Carroll’s. These totaled $1,109.30 leaving a general damage award of almost $1,400.00 had the jury excluded the bill associated with another condition.
We recently held:
In reviewing damage awards, the appellate standard of review is whether the trier of fact abused its discretion. Reck v. Stevens, 373 So.2d 498 (La.1979); Gravois v. Succession of Trauth, 498 So.2d 140 (La.App. 5 Cir.1986). To determine whether a jury abused its discretion in making the award the court must closely examine the particular facts of the case before it, since no two cases are fully alike. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Reck v. Stevens, supra; Rutherford v. Jenkins, 449 So.2d 701 (La.App. 5 Cir.1984). Where it has been determined that the trial court abused its discretion, the award can only be raised (or lowered) to the lowest (or highest) point which is reasonably within the discretion of the trial court. Coco v. Winston Industries, Inc., supra.
Johnson v. Pepperman, 512 So.2d 1225 (La.App. 5th Cir.1987) at 1227.
Considering the uncontroverted facts set forth at trial we find the general damages award, (even assuming Dr. Grunsten’s bill was not included in the award), to be so low as to constitute an abuse of discretion. We conclude the lowest reasonable amount the evidence will justify is $3,500.00 plus $1,109.30 for medical expenses.
DR. FINKELSTEIN: QUANTUM
The testimony at trial is uncontro-verted that Dr. Finkelstein suffered a ruptured disc as the result of the accident. Although there was speculation presented to the jury in closing argument that the cause of the injury was due to a tennis-related incident, there was no testimony that Dr. Finkelstein sustained such an injury. The only second injury proven was one occurring after the diagnosis of ruptured disc had been made.
In addition, although Dr. Finkelstein testified that he was injured in an earlier accident in the 1970’s he also stated he recovered from that and it was minor. There was no other evidence to refute his testimony.
Appellee argues that the jury based its award on the conclusion that the ruptured disc was located in a different area of the back than the area injured in the accident. Had the jury so concluded, that finding would have been manifestly erroneous.
Dr. Grunsten testified that the ruptured disc was the “lowest disc in his back on the left side ... where the last moving vertebra attaches to the pelvis.”
Dr. Carroll, who saw Dr. Finkelstein one day after the accident, related that “he complained of stiffness in the back, pain in *1028 his mid-back and headaches.” He found “tenderness in the back in areas T-8 through T-12 and pain and spasm were illicited on flat forward extension greater than seventy-five degrees and extension greater than ten degrees, lateral flexion to the right greater than fifteen degrees.” He explained that areas T-8 through T-12 are in the middle of the back.
On May 5, 1985 he complained to Dr. Carroll that his back pain was worse and appeared to be lower. Dr. Carroll found muscle tenderness in. the area of T-10 through L-3. Nevertheless, Dr. Carroll stated that the findings were compatible with the accident. He did not state that the low-back symptoms were unrelated to the accident. Dr. Carroll admitted on cross that it was later that Dr. Finkelstein complained of the L-5, S-l area. Dr. Carroll stated that when Dr. Finkelstein complained of the different location he did not suspect an additional trauma. It seemed to him “that he had a worsening of his problems and also a localization to a different area.” When asked to specify the location, Dr. Carroll stated:
I think the jury should understand that its very difficult to localize all of these with that degree of specificity. This is not as if one were dealing with a catscan or with X-rays where you actually see them. You’re using your hands and so when I say T-10 to L-3, you know, to be fair, we’re talking about, you know, two vertebrae in either direction as far as being able to feel these.
* * * * * *
this is not an exact science like Radiology-
[[Image here]]
I cannot be that accurate, maybe an otho-pedist can be more accurate than I am. But, if I say T-10 to L-3, an orthopedist following me up or people following us up with catscans or with x-rays might say what you’re calling T-10 is really T-ll or what you’re calling T-10 really T-9. We’re not dealing with absolute levels by physical examination. This is very difficult.
The jury awarded Dr. Finkelstein a total of $5,000.00 which included medical expenses. Considering the uncontroverted fact set forth at trial that Dr. Finkelstein sustained a ruptured disc from the accident and the absence of proof of a second injury which caused the disc rupture, we find the general damages award to be so low as to constitute an abuse of discretion. However, the jury evidently concluded that Dr. Finkelstein did not sustain pain and suffering to justify a higher award.
The testimony relative to Dr. Finkel-stein’s pain and suffering establishes that he continued to play tennis until July 1987, a period of approximately two and one-half years after the accident. In addition, Dr. Grunsten reported that his response to treatment has been satisfactory although he has discomfort on occasion. Dr. Grun-sten further speculated that it “may take two, three or four years before” he is symptom-free. Dr. Carroll stated that Dr. Finkelstein had a pre-existing degenerative disc disease which, although not a part of the injury, prevented him from resolving the disc problem as quickly as someone without such a condition.
Considering the above facts set forth at trial we find the general damage award, even allowing for the jury concluding that Dr. Finkelstein did not suffer substantial pain from the ruptured disc, to be so low as to constitute an abuse of discretion. We conclude the lowest reasonable amount the evidence will justify is a total of $17,500.00 for general damages and medical expenses.
Accordingly, the judgment of the trial court is hereby revised to increase the award to $17,500.00 in damages as it relates to Dr. Koleman Finkelstein.
Furthermore, the judgment of the trial court is hereby revised to increase the award to $3,500.00 for general damages plus $1,109.30 for medical expenses as it relates to Danica Finkelstein.
Finally, the judgment is affirmed in all other respects.
REVISED AND AS REVISED, AFFIRMED.