614 So.2d 811 (1993)
Vernon GRAHAM, Plaintiff-Appellant,
v.
Henry EDWARDS, Jr., Caddo Parish School Board and their Unknown Insurer, Defendants-Appellees.
No. 24,450-CA.
Court of Appeal of Louisiana, Second Circuit.
February 24, 1993.
Rehearing denied March 25, 1993.
*813 Davis & Singleton by S.P. Davis, Shreveport, for plaintiff-appellant.
Rountree, Cox & Guin by Dale G. Cox, Shreveport, for defendants-appellees.
Before SEXTON, BROWN and STEWART, JJ.
STEWART, Judge.
Vernon Graham sued Henry Edwards and his employer, the Caddo Parish School Board, and their insurer, United Community Insurance Company for personal injuries and property damage sustained as a result of a vehicular accident. Graham alleged that the accident was caused by Edwards' negligence while operating the Caddo Parish School Board's tractor. After a bench trial, the court found Graham 30 percent negligent, Edwards 50 percent negligent, and Audry Washington, a flagman employed by L.J. Earnest Construction Company, Inc., 20 percent negligent in causing the accident. Neither Washington nor L.J. Earnest Construction Company were sued by either party.
The trial court awarded Graham damages plus costs in the following amounts: general damages for pain, suffering and mental anguish, $2,250; medical expenses, $910; prescription medications, $43.39; property damage, $1,131.63; lost wages, $1,534.74, which totals $5,870. These amounts were awarded subject to the reduction for comparative negligence. The trial court also ordered costs to be paid as follows: 30 percent by Graham and 70 percent by defendants.
Graham appeals the trial court judgment alleging that the evidence necessitates an *814 increase in Edwards' percentage of fault as well as the award of general damages.
Defendants answer the appeal contending that the trial court erred in failing to allocate any fault to L.J. Earnest Construction Company, Washington's employer. Defendants also contend that the trial court should have allocated a greater percentage of fault to Graham and Washington. Defendants further allege that the trial court erred in failing to reduce the claim for lost wages by the amount of rent Graham paid to operate his business. We affirm in part, reverse in part, and render.

FACTS
On August 15, 1990 at approximately 3:00 p.m. on a clear day, Graham was driving his 1986 Chevrolet Camaro westbound in the inside or left lane on Hollywood Avenue in Shreveport, Louisiana. Edwards was also driving westerly but on a tractor while pulling a bushhog in the right outside lane. He had used the tractor and bushhog to cut grass for his employer, the Caddo Parish School Board. This area of Hollywood Avenue was undergoing construction for I-49 and a flagman, Audry Washington, was using a red flag to direct traffic into the left, inside lane because of the construction. The record reflects that motorists proceeding westbound from Southern Avenue would have seen an orange construction sign which indicated construction was going on in the right lane.
Graham testified that, as he turned off of Southern Avenue onto Hollywood Avenue, he observed a construction sign which said that the right lane was closed ahead. Upon seeing the sign, he moved into the left, inside lane of travel. While proceeding on Hollywood Avenue in the left lane, Graham observed the tractor and about five cars behind it in the right, outside lane. Graham noted that the tractor was driving very slowly and had cars backed up behind it. Graham drove ahead at approximately 20 to 25 mph and gradually neared the side of the tractor. Approximately 300 to 400 yards away, near St. Vincent Avenue, Graham observed the flagman waiving his red flag at traffic in the right, outside lane to move over into the left lane, due to the right lane's closure. According to Graham, as he proceeded up to the viaduct, his vehicle was slightly behind the tractor when he noticed the tractor coming over into his lane. As the tractor entered his lane, Graham stepped on his brakes, blew his horn, and tried to get closer to the viaduct on his left side, however, the impact from the tractor caused Graham's vehicle to strike the viaduct. The primary damage occurred to his vehicle's passenger door and front right fender. Graham testified that, but for the viaduct, he could have avoided the accident by pulling his vehicle far to his left. Graham further testified that he never saw any turn signal on the tractor or any other indication that Edwards was about to move over into his lane.
Edwards testified that he was traveling in the right lane on the tractor pulling the bushhog at approximately five miles per hour. Maximum speed on the tractor was twenty miles per hour. He acknowledged having seen a construction sign as he crossed Southern Avenue, however, he denied that he saw any sign indicating that the right lane was closed ahead. Edwards testified that as he continued toward the west side of the viaduct, he observed the flagman with two, red flagsone in each hand. According to Edwards, when the flagman puts down two flags, that means to stop, however, he saw Washington waive one flag to his left indicating for him to go to the left lane. Edwards testified that he immediately put on his left turn signal and entered into the left lane. As he put on his left turn signal, he looked back over his left shoulder and over the bushhog and saw no vehicle in the left lane. He stated that, in addition to the activated turn signal, he had his left hand out indicating the lane change. Upon impact with the Graham vehicle, the tractor and bushhog were all the way over into the left lane, according to Edwards. He admitted that impact occurred in the left lane but said that, when Graham hit the viaduct, Graham's vehicle then bounced back against his tractor. He denied forcing Graham over. Edwards estimated that Graham was going approximately 30 miles per hour upon impact. *815 There was no damage to the tractor or bushhog.
The only eyewitness to the accident was Audry Washington, an employee of L.J. Earnest Construction Company, Inc. It is not disputed that Washington was acting in the course and scope of his employment on the day of the accident. Washington testified that, on the day in question, it was clear and sunny. At approximately 3:00 p.m., he was standing on the St. Vincent Avenue side of the viaduct with a red flag. His duties were to flag traffic out of the right lane into the left lane because the right lane was closed due to construction. Washington testified that he had only one red flag and that was in his right hand. Washington had on an orange vest and was standing in the right lane waiving traffic into the left lane. At his trial deposition, Washington described how the accident happened thusly:
BY MR. DAVIS:
Q You could clearly see
A Right.
Q the tractor?
A I could.
Q In your opinion, could the tractor driver clearly see you?
A Yeah, he could see me.
Q Okay. And you continuously waived your flag to get him out of the way?
A That's correct.
Q Okay. And did he get over as you were waiving?
A He gotwhen he did get over, that's when he had hit the car.
Q Okay. And before we get to that point, prior to the tractor getting over, Mr. Washington, do you recall ever seeing any flashing lights on the tractor blink
A No.
Q before the accident?
A No.
Q Did you ever recall seeing the tractor with its turn signal on, signaling for a turn from the right lane to the left lane before the accident?
A No, I didn't. I didn't.
Q Okay. Would you tell and state for the record, Mr. Washington, exactly how the accident happened as you saw it that day?
A Okay. Well, like I was saying, I was flagging the traffic over. And the guy that was on the tractor, he kept coming. And I just said, "Hey, get over. Get over." You know, just, you know, doing like this here. (Indicating)
Q Okay.
A And he just got over, you know. And being on a tractor, you know, all he had to do was look, but he didn't look. He just come on over.
Q He just came on over?
A That's right.
Q Okay.
A And he come over on the car. And the car, he couldn't get over because he was up against the concrete like the pillow, whatever it is, the wall and stuff there.
Q Okay. So at the time that the tractor came over into the red car, was the red car on his side at that point?
A Right.
Q And did you see the driver of the tractor look to his left at any time before the accident?
A No. He just got over.
Q Okay.
A That's all he did. And the guy in the car, he blew his horn, you know, when he saw him coming over.
Q Okay.
A But there was nothing that he could do after that.
Q If the tractor driver had of looked to his left before turning left, would he have seen the red car?
MR. COX: Again, I am going to object to this witness speculating on what the tractor driver would have seen. But subject to that objection, go ahead and answer.
BY MR. DAVIS:
Q If the tractor driver had looked to his left before turning left, would he have seen the red car?
A Yes, he would have.

*816 Q Okay. And which lane of traffic, Mr. Washington, did the accident take place in?
A Okay.
Q Did it take place in the right lane where the tractor was, or in the left lane
A Left lane.
Q where the red car was?
A It was in the left lane.
No evidence was adduced from employees of L.J. Earnest Construction, or any other witness, regarding the nature of its construction work and the impact of such work on traffic signing requirements for the roadway. The investigating police officer merely testified that he had no recollection of any merge or construction signs. Defendants' answer to the appeal is devoid of any allegation against Earnest that its signing and procedures were defective.

LAW
Allocation of fault is a factual finding which an appellate court does not disturb unless, upon articulated and detailed analysis and reasons, that finding is demonstrated to be clearly wrong. Anderson v. Bennett Wood Fabricators, 571 So.2d 780 (La.App. 2d Cir.1990), writ denied, 573 So.2d 1135 (La.1991); Clark v. Ark-La-Tex Auction, Inc., 593 So.2d 870 (La.App. 2d Cir.1992), writ denied, 596 So.2d 210 (La. 1992).
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, whether superior or inferior; and (5) any extenuating circumstances which might require the actor to proceed in haste without proper thought. Anderson, supra; Watson v. State Farm Casualty Insurance Company, 469 So.2d 967 (La.1985).
LSA-R.S. 32:79 provides in pertinent part that,
Driving on roadway laned for traffic
Whenever any roadway has been divided into two or more clearly marked lanes for traffic, the following rules, in addition to all others consistent herewith, shall apply.
(1) A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety.
A motorist who attempts to change lanes on a multiple lane highway must ascertain before turning that the maneuver can be made safely without endangering normal overtaking or oncoming traffic. The greater burden of care is required for the motorist changing lanes than is demanded of a driver proceeding at a lawful rate of speed on a straight line in a marked lane. Averna, v. Industrial Fabrication, 562 So.2d 1157 (La.App. 4th Cir. 1990); Bamburg v. Nelson, 313 So.2d 872 (La.App. 2d Cir.1975), writ denied, 318 So.2d 57 (La. 75); Raymond, through Raymond v. Deaton, 423 So.2d 724 (La.App. 1st Cir.1982). Moreover, when there is a change of lanes by a motorist immediately preceding an accident, the burden of proof is on the motorist changing lanes to show that it first ascertained that his movement could be made safely. Averna, supra; Trabeaux v. Sanchez, 279 So.2d 793 (La. App. 4th Cir.1973); Kennedy v. Mitchell Engineering, 518 So.2d 1128 (La.App. 4th Cir.1987), writ denied, 523 So.2d 231 (La. 1988) and 523 So.2d 232 (La.1988).

DISCUSSION
The evidence is compelling that the plaintiff was already in the left lane when the defendant pulled his tractor into the side of the plaintiff's car. As noted by the trial court, Edwards' testimony was inconsistent. He first stated that he did not move toward the plaintiff's vehicle in switching lanes but later admitted that he did in fact switch lanes before the impact. The only eyewitness, flagman Washington, refuted Edwards' contention that the left turn signal of the tractor was activated prior to his lane switch. No one saw Edwards *817 give a signal with his left arm. Washington's testimony is very persuasive that Edwards changed lanes without first ensuring that it was safe to do so. The trial court's finding that even if Edwards had looked, he did not see what he should have seen and should not have proceeded to the left lane is amply supported by the record. We agree further that Edwards' reliance on the flagman does not exculpate him from negligence or his duty to observe.
More troubling to us is the trial court's allocation of 30 percent negligence to the plaintiff, Graham. In reasons for judgment, the trial court related that Graham admitted that he knew that the tractor would have changed lanes and he knew that the right lane had been blocked because he had traveled this road previously. Even when examined under the manifest error standard, we cannot agree that these facts are tantamount to negligence by Graham. Graham was in the proper lane going between 20 and 30 miles per hour when the tractor driver suddenly moved over into his lane. There is no evidence to show, and the trial court made no finding, that Graham's speed contributed to the accident. Simply put, once the tractor started moving over, Graham had no place to go. Washington corroborated Graham's evasive actions: (1) braking, (2) blowing his horn, and (3) pulling left into the viaduct in an effort to avoid the collision. According to Graham and Washington, Graham received no indication from Edwards of his intent to merge into Graham's lane of travel.
Thus, we find Graham's actions to be reasonable under the circumstances. We have discovered no cases which hold that a motorist's mere knowledge that traffic in an adjacent lane will eventually merge into the same lane as the motorist is sufficient to warrant a finding of negligence. To the extent that the trial court so held, it was in error. The trial court was clearly wrong in allocating any fault to Graham.
With respect to the flagman, Washington, the trial court apparently found him negligent because he was simply waiving the people into the outside lane over to the inside lane, rather than assisting them to merge and/or stopping them if necessary. Under the circumstances that here existed, it is undisputed that everyone saw the flagman and the road conditions in ample time to slow down and stop if necessary. Edwards testified that he did not stop because he would have backed up traffic, however, the evidence is overwhelming that while traveling five miles per hour from Southern Avenue to the viaduct, traffic was already backed up behind him. The burden of prevention on the part of Edwards was slight, i.e., going from five miles per hour to a complete stop in order to safely merge into the other lane of traffic. The trial court found that Edwards moved into the left lane in response to the flagman's efforts, without even looking. Washington testified unequivocally that Edwards paid little attention as he continued toward Washington at a constant speed and that Edwards suddenly moved into Graham's lane without warning. Edwards admitted that he saw the flagman long before he reached the point of impact. Given the clear, sunny weather conditions, the orange vest worn by the flagman, the positioning of the flagman in the right lane of traffic, and his consistent motioning of all right lane traffic into the left lane, the evidence reveals no duty that was breached by the flagman under these circumstances. The trial court's allocation of fault to the flagman and thus, vicariously to L.J. Earnest Construction Company, Inc., because "he did nothing to try and stop the plaintiff or the tractor from colliding" is clearly wrong.
There is no evidence of record which establishes that the flagman or his employer had a duty to post merge signs or that the absence of such signing was a legal cause of the accident. The flagman's waiving of right lane traffic to merge because of road construction did not operate to relieve Edwards of his duty to first ascertain that his movement could be made safely. Averna, supra.
In sum, having failed to exercise his duty pursuant to LSA-R.S. 32:79, Edwards, and vicariously the Caddo Parish School Board and United Community Insurance Company, *818 are 100 percent at fault in causing the accident.

QUANTUM
Before a trial court award for damages can be questioned as inadequate or excessive, the reviewing court must look first, not to prior awards, but to the individual circumstances of the present case. A damage award should not be disturbed by a reviewing court absent a showing of a clear abuse of discretion vested in the trial court. Carroll v. St. Paul Insurance Company, 550 So.2d 787 (La.App. 2d Cir. 1989); Reck v. Stevens, 373 So.2d 498 (La. 1979).
It is only after an articulated analysis of the facts discloses an abuse of discretion that resort to prior awards in similar cases is proper. Carroll, supra.
The appropriate procedure for testing whether the trier of fact has abused its discretion by making an excessive award is to determine whether the award can be supported under the interpretation of the evidence most favorable to the plaintiff which reasonably could have been made by the fact finder. The converse of this rule is also true. In determining whether the trier of fact abused its discretion in making an inadequate award, the evidence must be viewed in the light most favorable to the defendant. Higginbotham v. Ouachita Parish Police Jury, 513 So.2d 537 (La.App. 2d Cir.1987); Carroll, supra.
Once it is determined that the trial court has abused its discretion, "the award can only be raised (lowered) to the lowest (highest) point which is reasonably within the discretion of the trial court." Emerson v. Empire Fire and Marine Insurance Company, 393 So.2d 691 (La.1981); Rachal v. Agudosi, 496 So.2d 1274 (La.App. 3d Cir.1986).
Before questioning the adequacy or inadequacy of the award, we must first look not to the prior awards but to the individual circumstances of the case before us. Reck v. Stevens, 373 So.2d 498 (La.1979).
Graham testified that, upon impact with the viaduct and the tractor, he sustained injuries to his neck, left wrist, middle of the back, and knees. Graham was treated by Dr. Joseph Sarpy, a general practitioner, from August 28, 1990 to his discharge date of September 14, 1990. Dr. Sarpy noted objective signs of injury upon examination and prescribed conservative treatment. Graham received prescriptions for pain, muscle relaxers, and twice weekly hot pack therapy to his sore areas. Upon discharge on September 14, 1990, Dr. Sarpy reported Graham to be relatively free of pain. The injuries sustained by Graham caused soreness for several weeks according to Graham's testimony and that of Dr. Sarpy. Graham testified that he experienced problems standing for long periods of time in his job as a barber and also pain in this wrist which caused him to work fewer hours than prior to the injury. Graham's work journal reflects fewer hours worked after the accident with a corresponding decline in his gross income for the same period of time. Graham testified that he was unable to take as many customers as he had been previously able to because of his inability to stand for long periods of time or to use his cutters because of the pain in his wrist.
The trial court found that the plaintiff sustained a minor soft tissue injury with physical objective signs noted by Dr. Sarpy. It found further that Graham received medical treatment approximately 17 days during the six weeks following the accident. It acknowledged that Graham testified to complaints of pain and discomfort for several weeks after he was discharged from Dr. Sarpy.
After reviewing the record, we conclude that the trial court's general damage award of $2,250 is inadequate under the circumstances and constitutes an abuse of discretion. Having found that the trial court abused its discretion by making an inadequately low award, we may only raise the award to the lowest reasonable point. Carroll, supra. Only after a determination of abuse of discretion has been reached, as in the present case, is a resort to prior awards appropriate for purposes of *819 then determining what would be an appropriate award for the present case. Carroll, supra.
After comparing Graham's injuries and awards to those of other plaintiffs in prior cases, we conclude that the lowest award that could have been granted in the plaintiff's favor was $3,500. Accordingly, we raise the plaintiff's award from $2,250 to $3,500. See Piper v. Gahagon, 599 So.2d 439 (La.App. 4th Cir.1992); Gotro v. Town of Melville, 527 So.2d 568 (La.App. 3d Cir. 1988); Finkelstein v. Pena, 538 So.2d 1022 (La.App. 5th Cir.1989); see also, and compare Prados v. Reynaud, 550 So.2d 385 (La.App. 3d Cir.1989); King v. Aetna Life and Casualty Insurance Co., 552 So.2d 73 (La.App. 3d Cir.1989), writ denied, 556 So.2d 1264 (La.1989); Mims v. Reliance Insurance Company, 535 So.2d 1085 (La. App. 2d Cir.1988).

LOST WAGES
Defendants contend the trial court's award to Graham of $1,534.74 in lost wages is erroneous. The trial court noted in its oral reasons for judgment that it arrived at this amount by calculating the average three preceding months of gross wages prior to the accident and then reducing that amount by 25 percent for the overhead expense which was not incurred as a result of the accident according to plaintiff's testimony. Defendants urge that in failing to deduct an additional $300 per month for rent, the trial court committed error.
The proper measure for damages for lost profits in the case of a sole proprietor is net loss, i.e., gross income less all business expenses incident to the operation of the business. Frye v. Joe Gold Pipe & Supply Company, 50 So.2d 38 (La.App. 2d Cir.1951); Hardie v. Pylant, 375 So.2d 189 (La.App. 2d Cir.1979); Jones v. Rogers, 179 So.2d 674 (La.App. 2d Cir.1965).
As this court stated in Clark, supra, 593 So.2d at 878-879:
Loss of business profits or loss of personal income resulting from an offense or quasi-offense are items of special damages which in many cases are not susceptible of proof to a mathematical or legal certainty. However, loss of profits or income must be proved with reasonable certainty, i.e., by the more probable than not standard, and the award cannot be based on speculation and conjecture. The trier of fact must be afforded much discretion in the determination of such damages where the evidence clearly shows the damage is proven but is not capable of proof to a mathematical or legal certainty. To determine whether the trial court abused its discretion by making an excessive award, we must decide whether the award can be supported under the interpretation of the evidence most favorable to the plaintiffs which reasonably could have been made by the fact finder. Bailes v. U.S. Fidelity & Guaranty Company, 512 So.2d 633 (La. App. 2d Cir.1987).
Graham testified that in addition to his 25 percent overhead for supplies, he was required to pay $75 per week for rent. Defendants urge that the court should have deducted this sum in addition to the 25 percent overhead in order to calculate the award for lost profits. Defendants argue that taking the proper deduction for rent would yield a lost profit award of $657.49.
Graham testified that he was self-employed and worked in the Esquire Barber Shop which was owned by his mother. He testified he paid $75 per week for rental of his space. There were two other barbers in the shop who worked independently and paid their own respective expenses. Graham paid no utilities because that was covered in his rental fees.
Plaintiff's Exhibit No. 5 was admitted into evidence as plaintiff's Income Journal. Graham testified that he kept the journal and recorded daily the cash sales that represented hair cuts and other services he rendered. The journal also contained periodic entries for supplies purchased as well as a column under Returns/Allowances which actually represented his total gross sales received during each week. At the bottom of each journal page, the total gross sales received for the month were *820 recorded. The journal shows a marked decline in gross sales for August, September, and October as compared to prior months. On cross-examination, Graham was asked if there was any place in the journal where he recorded his rent. He responded, "no." Graham was never asked, and the record is otherwise silent, concerning whether or not he continued to pay rent to his mother during his recuperation.
In calculating the lost wages award, the trial court may well have considered that, in view of Graham's marked decline in gross sales for the months in question, the evidence did not clearly show that he continued to pay rent to his mother, thus warranting further deductions from gross sales. Viewing the evidence in the light most favorable to the plaintiff and in view of the discretion afforded the trier of fact, we find no error in the trial court's award of damages for loss of past wages in the amount of $1,534.79. Therefore, we find no merit in this assignment of error.

CONCLUSION
For the above stated reasons, the trial court judgment is reversed with respect to the allocations of fault and amended and affirmed as to the general damage award. The judgment is recast as follows:
IT IS HEREBY ORDERED, ADJUDGED AND DECREED that there be judgment herein assigning the following percentages of comparative negligence with respect to the accident which is the subject of this litigation:

Vernon Graham 0%
Henry Edwards 100%
Audry Washington 0%

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of plaintiff, Vernon Graham, and against defendants, Henry Edwards and the Caddo Parish School Board, in the following amounts:

General Damages for pain, $3,500.00
 suffering and mental anguish
Medical Expenses 910.00
Prescription Medications 43.39
Property Damage 1,131.63
Lost Wages 1,534.74
 _________
 TOTAL $7,119.76

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the expert witness for Dr. Sarpy be and is hereby fixed at $200 and taxed as a court cost in these proceedings.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the defendants be cast with all court costs in this court and the court below.
REVERSED IN PART, AMENDED AND, AS AMENDED, AFFIRMED.

APPLICATION FOR REHEARING
Before SEXTON, VICTORY, BROWN, STEWART and WILLIAMS, JJ.
Rehearing denied.