691 So.2d 1344 (1997)
Raymond C. MARCEL, Jr., et al.
v.
Charles Donald BECNEL and Gradel Research Corporation.
No. 96 CA 1139.
Court of Appeal of Louisiana, First Circuit.
March 27, 1997.
*1345 Allen A. McElroy, Jr., Berwick, for Appellees Plaintiffs.
Thomas D. Fazio, Baton Rouge, for Appellant Defendant Louisiana Insurance Guaranty Association.
Randell E. Treadaway, Metairie, for Appellant Defendant Sigma Welders & Fabricators, Inc.
Robert A. Barnett, New Orleans, for Appellants Defendants Charles Donald Becnel and Gradel Research Corp.
Before LOTTINGER, C.J., and FOIL and FOGG, JJ.
FOIL, Judge.
This appeal challenges numerous aspects of a trial court's liability, damage, and insurance coverage determinations. After a thorough review of the record, we reverse the court's coverage ruling as well as its' award for lost profits. We affirm the liability ruling and enter an award for costs incurred by plaintiffs.

FACTUAL AND PROCEDURAL BACKGROUND
Plaintiffs, Raymond Marcel, Sorbent Recyclers, Inc. and G & P Supply Inc., filed this lawsuit for negligent misrepresentation and negligent performance of engineering services against Charles Donald Becnel, Gradel Research Corporation and the Louisiana Insurance Guaranty Association. LIGA was brought into the lawsuit due to the insolvency of Pelican State Mutual Insurance Company, which issued a commercial general liability insurance policy to Gradel.
The record reflects that Raymond Marcel invented a machine that could remove contaminates, such as oil, from sand, rocks or shells. He built the prototype unit with the assistance of welders and called it a "small debris and sand cleaner." Marcel applied for a patent for his cleaning machine and was required to engage someone to prepare professional drawings on his prototype unit in the patent process.
Marcel's invention was displayed at an oil and gas show, where James O'Brien, an environmental consultant in the field of oil and chemical spills, saw the unit function and expressed interest in developing Marcel's concept into a marketable product. O'Brien envisioned several environmental uses of the invention, such as cleaning up beaches and pit enclosures. Marcel's prototype was capable of removing contaminates from three cubic yards of material in a ten hour shift. O'Brien believed that to be marketable for use in the clean-up industry, the productivity of the machine would have to be increased to enable the machine to handle eight cubic yards of material in a ten hour shift. Additionally, the machine would have to be of compact design so that it could be easily transported from job site to job site.
O'Brien agreed to finance the project to redesign Marcel's prototype, and formed Sorbent Recyclers, Inc. for that purpose. Marcel and Sorbent entered into an "Exclusive Patent License Agreement" on November 19, 1991. The agreement recognized that Marcel applied for a patent for his sand *1346 and debris cleaning system with the United States Patent and Trademark Office, and granted Sorbent the exclusive right to manufacture and sell the licensed invention. In exchange for the exclusive rights under the agreement, Sorbent agreed to pay Marcel a royalty of 20% of the profits derived from the sale or lease of any cleaning units.
Because Marcel had no training in engineering or product design, he sought to engage professional assistance in redesigning his prototype. He believed that he needed to find a mechanical engineer with knowledge of structural design to redesign his prototype. He was introduced to Charles Becnel, a mechanical engineer and the owner of Gradel Research Corporation. Becnel informed Marcel that he was a mechanical engineer, and provided him with a resume and brochure listing his qualifications.
In the documents, Becnel revealed that he had a bachelor of science in engineering science and a master of science from Louisiana State University in mechanical engineering. His resume sets forth that he had experience in the fields of mechanical, electrical, instrumentation, communications and software engineering, field construction engineering, as well as other consultant fields. After reading the resume and brochures, Marcel stated, he believed that Becnel possessed the qualities necessary to develop his prototype into an economically viable unit, and Becnel was engaged on the project.
Marcel testified that the documents led him to believe that Becnel was a licensed mechanical engineer. The documents do not state that Becnel was licensed by the State of Louisiana as a mechanical engineer. Marcel also admitted that Becnel never told him that he was licensed. It is undisputed that Becnel and his corporation were never registered with the Louisiana State Board of Registration for Professional Engineers and Land Surveyors as required by law.[1]
The record reflects that Becnel prepared sketches of the redesigned prototype, which were submitted to Sigma Welders & Fabricators, Inc., the company initially engaged to fabricate the unit. The redesigned machine did not function, and the unit was brought to another machine fabrication shop. It is undisputed that the redesigned machine did not work. After investing nearly $90,000.00 on the redesign project, O'Brien withdrew his funding. At some point in time, Marcel's patent application was rejected because the technology behind his invention was already in existence. Marcel sold his concept, the original prototype and redesigned unit to another company.
In this lawsuit, plaintiffs sought to recover the lost profits they could have realized from the sale or lease of Marcel's invention from defendants, the costs incurred in developing the non-functional redesigned unit, and other tort damages. Plaintiffs advanced two theories of liability: (1) Becnel provided them with faulty and substandard engineering services and (2) Becnel misled them into believing he was a licensed professional engineer, when in fact, he was not.
Coverage of the Pelican policy was disputed at trial, with LIGA insisting that the professional liability exclusion contained therein precluded coverage on plaintiffs' claims. The trial court found coverage on plaintiffs' negligent misrepresentation claim. It also found that defendants were liable to plaintiffs for lost business profits in the amount of $250,000.00, and entered judgment for that amount.
This appeal followed, in which Becnel/Graydel raised objections for the first time in this court, disputed the liability finding on numerous procedural bases, and attacked the amount of damages awarded. LIGA also appealed, contesting the coverage determination. Plaintiffs answered the appeal, seeking an increase in the amount of damages awarded.

COVERAGE
Pelican State Mutual Insurance Company issued a commercial general liability policy of *1347 insurance to Gradel Research Corporation. The policy lists Gradel's business as providing assistance to engineers in calculations to install pumps, piping and equipment. The policy contains the following exclusion:

EXCLUSIONENGINEERS, ARCHITECTS OR SURVEYORS PROFESSIONAL LIABILITY:
This insurance does not apply to "bodily injury," "property damage," "personal injury" or "advertising injury" arising out of the rendering or failure to render any professional services by or for you, including:
1. The preparing, approving, or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications; and
2. Supervisory, inspection or engineering services.
Charles Becnel, the director of and the sole shareholder in Graydel Research Corporation, admitted that he had discussions with his insurance agent about obtaining professional liability insurance. He stated that the subject first came up when he needed professional liability insurance to work on a particular job. Becnel attested that his agent attempted to obtain professional liability coverage with five different carriers, but all denied coverage because Becnel did not have an engineering license, and he had no licensed engineers working for his corporation.
Plaintiffs' first theory of liability is that Becnel provided them with substandard engineering services. This theory was proven at trial. Thomas Goyne, an electrical engineer with experience in fabrication and construction, testified that Becnel's work on the project was substandard. He attested that at a minimum, the redesign project required that the engineer prepare detailed plans and drawings setting forth specifications for the fabricator to build the machine. However, Becnel only provided the fabricator with "sketches," which contained little or no information on them. Mr. Goyne stated that no fabricator could build a unit from the sketches prepared by Becnel. Mr. Goyne believed that Becnel's work as a mechanical engineer on the project was substandard, as was his work from a technical standpoint, such as draftsmanship.
Because plaintiffs' first theory of liability is based on Becnel's failure to prepare appropriate drawings, designs and specifications on the project, it falls within the clear language of the professional liability exclusion. Plaintiffs' second theory of liability is that Becnel negligently misled them into believing that he was a licensed mechanical engineer, when he in fact was not. Plaintiffs claimed that Becnel's resume, listing his broad engineering experience, led them to believe that he was a licensed engineer. They averred that had they known Becnel was not licensed, they would not have engaged him to work on their project. Their reliance on his negligent misrepresentation, they insist, led to their damages.
The trial judge concluded that this theory of liability fell outside the scope of the professional liability exclusion because Becnel's conduct in furnishing plaintiffs with his resume was not a professional act. Furthermore, the judge believed that Becnel's conduct in leading the plaintiffs to believe that he was capable of handling the redesign project was not professional in nature, but was instead unprofessional, and thus outside of the scope of the exclusionary clause.
We disagree with this approach. It is undisputed that Becnel had an advanced mechanical engineering degree. Plaintiffs attempted to base liability on his failure to apprise them that he did not have a license from the State of Louisiana. To prevail in an action for negligent misrepresentation, a plaintiff must prove that the defendant had a duty to supply correct information, that the defendant breached that duty, and that defendant's breach caused damages to plaintiff. National Council on Compensation Insurance v. Quixx Temporary Services, Inc., 95-0725 (La.App. 4 Cir. 11/16/95); 665 So.2d 120, 122. It is not sufficient that plaintiffs merely establish that Becnel led them to believe that he was a licensed mechanical engineer and that they relied on this misrepresentation in engaging his services: they must further *1348 demonstrate that the misrepresentation caused their damage.
Plaintiffs claimed that they were damaged because they were unable to develop Marcel's invention into a workable, marketable product. The cause of their damage was the failure of Becnel to provide them with the professional engineering services he led them to believe he could provide. The policy clearly states that it does not apply to the rendering or failure to render any professional services including engineering services. Becnel's failure to provide them with professional engineering services, whether based on his substandard performance or his lack of qualifications, is plainly excluded from coverage. Furthermore, to find coverage simply because an unlicensed engineer who performed engineering services held himself out to be a licensed engineer would subvert the entire purpose of the exclusionary clause.
For these reasons, we find that the misrepresentation claim falls within the scope of the exclusionary clause, and we reverse the trial court's coverage determination.

BECNEL/GRAYDEL'S CHALLENGES
Becnel/Graydel filed two exceptions in this court, raising the objections contained therein for the first time in this litigation. First, they claim that Russell Gros, who introduced Becnel and Marcel, and Sigma Fabricators, which fabricated the redesigned unit, were indispensable parties. The record demonstrates that Sigma was a defendant in the action, but was dismissed by plaintiff from the litigation prior to the start of trial. Furthermore, we find no support for the claim that Russell Gros is an indispensable party, and we overrule this objection.
Likewise, defendants' exception of no cause or right of action lacks merit. This claim is based on the trial court's finding of individual liability on Becnel's part. At no time did Becnel raise the corporate shield as a defense to his personal liability in the trial court, and he may not do so now for the first time on appeal. Accordingly, these exceptions are overruled.
Defendants' next set of challenges is directed toward alleged procedural errors committed by the trial judge. Defendants contest the overruling of their venue exception, as well as the trial judge's refusal to grant a continuance on the day of the trial. Defendants also insist that certain comments made by the trial judge demonstrate that the judge was biased against them. After reviewing the record, we find no merit to defendants' procedural challenges.

DAMAGES
Defendants appeal the damage award on the basis that it was based on speculation and conjecture. Plaintiffs answered the appeal and sought an increase in the damage award to reflect the costs they incurred during the course of the redesign project.
The trial judge awarded $250,000.00 for lost profits. Evidence on lost business profits was offered through the testimony of Ruston Johnson, the owner of an oil and chemical clean-up response company, who stated that he talked to his clients about Marcel's cleaning machine. He noted that his clients were interested in a compact, mobile cleaning unit, and that they would be interested in leasing three cleaning machines from plaintiffs if the machines could be developed.
Richard Hoban, a certified public accountant, contacted individuals in the clean-up industry and questioned them regarding what they thought a cleaning machine would be worth if it could process eight to ten cubic yards of material in an eight to ten hour shift, which is the productivity goal Marcel sought for his redesigned unit. His figures were based in part on the statement by Mr. Johnson that he identified three customers who were interested in leasing three units at a total of $5,000.00 per month. He used a three year term to identify plaintiffs' lost profits because the agreement between plaintiffs specified a three year term in the event that Marcel was unable to obtain a patent for his machine. It is undisputed that Marcel was denied a patent because the concept he developed was already in existence.
The CPA estimated the lost business profits to range from $530,000.00 to $850,000.00. The first figure was based on the event that *1349 three units would have been sold directly to a contractor. The second figure was based on the lease of three units over a three year period.
Without offering any explanation, the CPA assumed that it would cost $150,000.00 to develop three redesigned units for the market. He admitted that he did not do an analysis to determine the actual costs involved in developing Marcel's concept into a marketable product.
It is true that loss of business profits in many cases are not susceptible of proof to a mathematical or legal certainty. However, loss of profits must be proved with reasonable certainty, that is, by the more probable than not standard. An award of lost profits may not be based on speculation and conjecture. Graham v. Edwards, 614 So.2d 811, 819 (La.App. 2d Cir.), writ denied, 619 So.2d 547 (La.1993).
After reviewing the record, we can only conclude that the trial court erred in concluding that plaintiffs proved this element of damages. The testimony offered by plaintiffs on lost profits was entirely speculative. Because the concept behind Marcel's invention was already patented, and there was no expert evidence showing that Marcel's prototype could in fact be rebuilt to meet the productivity and size criteria sought by the plaintiffs, the marketability of Marcel's invention was not proven with reasonable certainty.
Furthermore, loss of profits is generally calculated by deducting the expenses that would have been incurred from the gross revenues that could have been realized. Rosbottom v. Office Lounge, Inc., 94-894 (La. App. 3 Cir. 4/5/95); 654 So.2d 377, 378. In arriving at a lost profit figure, the CPA admitted that he did not do an analysis of the costs involved in developing the prototype into a marketable product, but he assumed a cost of $50,000.00 per unit calculating lost profits.
There was no credible evidence showing, with reasonable certainty, the production and operational costs involved in making the invention a marketable product. In the absence of such evidence, any award for lost profits could only be based on sheer speculation and conjecture. Due to the speculative nature of the testimony adduced at trial, we find that the award for lost profits was not proved by a preponderance of the evidence, and we hold that the trial court erred in entering an award for lost profits.
We next address plaintiffs' claim that the trial court erred in failing to award the costs incurred in the redesign project. Plaintiffs offered evidence showing that $89,432.33 was spent on the redesign project. We agree that the trial court should have awarded plaintiffs $89,432.33 as costs incurred on the failed project. Pursuant to the terms of the Patent Agreement between Marcel and Sorbent Recyclers, we conclude that Marcel is entitled to 20% of this award, and Sorbent/G & P Supply, Inc. is entitled to receive 80% of this award.

CONCLUSION
Based on the foregoing, the judgment is reversed insofar as it found coverage under the policy of insurance and insofar as it awarded damages for lost profits. The judgment is amended to reflect an award to plaintiffs in the amount of $89,432.33. In all other respects, the judgment is affirmed.
AFFIRMED IN PART, REVERSED IN PART AND AMENDED.
NOTES
[1] In 1995, after the events leading to this lawsuit transpired, Becnel and Gradel entered into a consent order with the Louisiana State Board of Registration for Professional Engineers in which Becnel agreed to make it clear on his resume that he is not a Louisiana registered professional engineer and that he would delete any language in his resume appearing to identify him as an engineer legally qualified to practice engineering.